[No. B046298. Second Dist., Div. Seven. Mar. 26, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT EDGAR WEBBER, Defendant and Appellant.

1150

**COUNSEL**

David Harrell and Maureen DeMaio, under appointments by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Linda C. Johnson and Juliet H. Swoboda, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WOODS (Fred), J.**—Defendant, who was convicted of second degree murder and false imprisonment, contends that the court made numerous erroneous rulings relating to the rejection of requested instructions, the use of prior arrest reports, and various sentencing errors. Since we conclude that the court improperly refused to give an involuntary manslaughter instruction, we reverse the murder conviction and affirm the false imprisonment conviction.

FACTUAL AND PROCEDURAL SYNOPSIS

1. *Procedural history*

In an information filed on March 20, 1989, appellant was charged in count I with murder in violation of Penal Code section[1] 187, subdivision (a). It was further alleged that the offense was a serious felony within the meaning of section 1192.7, subdivision (c)(1) and that appellant personally used a firearm within the meaning of sections 1203.06, subdivision (a)(1)

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

and 12022.5, which also caused the offense to become a serious felony pursuant to section 1192.7, subdivision (c)(8). Appellant was charged in count II with kidnapping in violation of section 207, subdivision (a). It was further alleged that the offense was a serious felony within the meaning of section 1192.7, subdivision (c)(20) and that appellant personally used a firearm within the meaning of section 1203.06, subdivision (a)(1) and 12022.5, which also caused the offense to become a serious felony within the meaning of section 1192.7, subdivision (c)(8).

A jury found appellant guilty as charged in count I and found the murder to be of the second degree. The jury also found the allegation that appellant personally used a firearm to be true. On count II, the jury found appellant guilty of the lesser included offense of false imprisonment by force, menace or duress in violation of section 236. The jury also found to be true the allegation that appellant personally used a firearm.

Appellant was sentenced to 15 years to life on count I, plus 2 years consecutively on the section 12022.5 enhancement. Imposed consecutively on count II was the upper term of three years, plus two years on the section 12022.5 enhancement. The abstract of judgment states that the sentence on count II is consecutive to the sentence on count I.

Appellant's motion for a new trial was denied, and appellant filed a timely notice of appeal.

We granted respondent's petition for rehearing.

2. *Factual history*

A. *Prosecution case*

Franklin Bass, who was in the Navy and stationed in Long Beach, shared an apartment with Dawn Reeves when he was not on board ship. On the evening of January 14, 1989, Franklin, Dawn and Tim Clark attended a birthday party for the children of Dawn's friends and returned to their Ontario apartment at 11 p.m. Later that evening, Skip Reeves (Dawn's brother) and appellant stopped by to visit.

Bass knew Skip, but had never met appellant before. When Skip and appellant entered the apartment, the others were watching television and talking. Bass had just gotten a beer from the refrigerator. Skip introduced appellant. All five participated in a general conversation. Appellant sat in the corner, but did not do anything unusual. When Bass asked appellant if

he wanted a drink, appellant said he did not want alcohol because it tasted like shit.

After an hour or so, Bass became tired and went to sleep on the bed in the studio apartment. Everyone was acting calmly. Bass had consumed three beers and a portion of another beer during the course of the evening.

Bass woke up because he heard Dawn screaming from the bathroom. She said: " 'Frank, what's going on out there?' " She was yelling at Tim and appellant to find out what was going on.

Bass rose up and saw appellant on top of Tim, who was laying on the other bed. Appellant had his left hand around Tim's throat and a .38-caliber revolver to Tim's head. Appellant was threatening Tim. Bass was about four feet away from Tim and appellant. During the scuffle, appellant told Tim that he would come back for Tim. Appellant said: " 'There's bats, knives, guns; your choice, but I'm coming to get you.' "

Bass raised his hands up, trying to avoid any threatening gestures, and walked toward appellant. Appellant pulled the gun away from Tim's head and told Tim to keep his mouth shut.

Dawn came out and began yelling at Tim. Tim became angry and began yelling at appellant. Tim told Dawn that appellant had threatened him with a gun and had threatened to kill him. Dawn did not seem to believe Tim.

Appellant was sitting on the couch, glaring at Tim and making gestures as if to say "come on." The gun was in appellant's jacket at this time.

Tim wanted to confront appellant, but Dawn insisted on trying to find out what had happened. Dawn pushed Tim to the kitchen while appellant stared at Tim. Bass went towards appellant, trying to keep appellant away, making sure appellant did not reach into his pocket again. Dawn asked Bass to get appellant out of there because Tim was mad.

Bass told appellant to leave. Appellant stood up, and Bass stood between Dawn and appellant. Bass used his raised hands and chest. Bass said, " 'I am not armed. I am not trying anything but you have to leave.' " When the two men went outside, Bass locked and shut the door behind him. Bass then thought, " 'Wow, you're outside now. This man has a gun. What are you going to do?' "

Bass turned around and saw that appellant was pointing the gun directly at him. Bass raised his hands and said, " 'I've got my car keys. I'll take you

any where [*sic*] you want to go, but I can't let you come back into the apartment.'" Appellant pointed the gun at Bass, and Bass heard the distinct clicking sound of the hammer going back. Appellant ordered Bass to drive, and the two walked to the car. Appellant was behind Bass, pulling the hammer back and then releasing it, causing a clicking sound.

Appellant spoke of going back to the apartment, and Bass told appellant that appellant could not do so. Bass, who was scared, kept thinking, " 'What am I doing. I've got to get out of this. That gun could go off while he's doing that.'" Bass unlocked the passenger's and driver's doors. Bass got in the driver's seat, and appellant got in the passenger seat.

As Bass drove, appellant told Bass to turn left or right, which Bass did. Appellant ordered Bass to run red lights at different times, and ordered Bass to drive faster at other times. During this time, appellant was pointing the gun at Bass.

Bass noticed the gun was being held across appellant's chest and appellant was rocking back and forth. Bass was busy driving his car, which had a manual transmission. Appellant was making remarks about capping off a few rounds and shooting somebody.

As Bass was driving, he saw that two sheriff's cars had pulled someone over on the right shoulder of Mission Boulevard. Bass decided to drive up behind the sheriff's vehicles, get out of the car, raise his hands and tell the deputies that appellant had a gun. Bass began to slow up and move from the left hand lane to the right hand lane, when appellant said, " 'Good idea. I am going to get some pigs. I am going to cap off a few rounds.'" With that, appellant stuck the gun out of the passenger side window.

Bass speeded up and moved the car away from the cops; Bass speeded up to 90 from 60 miles per hours in a 45-mile zone. Appellant screamed, " 'You made me miss'" and cussed at Bass.

As they entered Pomona, westbound on Mission, Bass saw a black Mustang traveling in the same direction. The Mustang was in the lane nearest the curb, while Bass was in the lane nearer the center. The driver of the Mustang was looking straight ahead and had his hands on the wheel. There was no contact between the two cars.

Both cars stopped at a light. Bass got away from the light first, but appellant told Bass to slow down. Appellant kept telling Bass to slow down, then to speed up, always staying a little ahead or behind the black Mustang. Appellant said, " 'Look, they got a shotgun. They're going to shoot at us.'"

Bass looked over to see the driver of the black Mustang just driving with his hands on his wheel and looking straight ahead. Bass did not see a shotgun. The driver's window of the Mustang was rolled up.

Appellant kept saying that they would shoot us, that they're from out of town. Appellant said, " 'You're going to see what happens when people been a Dick to me.' " Appellant pulled the gun in and out of the window and then stuck it out the window. Bass heard shots and broken glass. Bass counted five rapid shots; appellant's gun held six bullets. Bass saw that the black Mustang was half a car length ahead and appellant's arm was out of the window with the gun pointed at the Mustang.

Bass never saw a window rolled down on the black Mustang or any kind of weapon in that car. Bass never saw the driver of the Mustang looking in their direction or witnessed any contact whatsoever with the Mustang.

Officer Thomas C. Marchetti of the Los Angeles Police Department had been heading home with his friend Dean Zacharis in a black Mustang on Mission. Zacharis was driving the Mustang, and Marchetti was the passenger. Marchetti heard gunfire, and the driver's side window of the Mustang came crashing in and hit Marchetti in the face. Marchetti went down, and when he came up, he saw Dean's head lying in his direction. Marchetti saw blood coming from the left side of Dean's head and thought Dean had been shot in the head. The car was still traveling in a straight direction when Dean's hands went down. The Mustang's windows were tinted black. Marchetti said that they had had no experiences or contacts of a negative nature with anyone else on the road.

Marchetti did not see from where the shots were fired. He grabbed the wheel and stepped on the gas to get out of the killing zone. Marchetti stopped at a doughnut shop and summoned the police.

As soon as Bass heard the shots, he speeded up. When Bass looked over, he saw the Mustang continue moving straight ahead. Bass made a left turn. Bass made a second left turn on appellant's order. Bass saw appellant reload the gun and toss the shells out of the window.

Appellant said he had $4,000 on his person with which to bribe witnesses. Bass drove straight ahead except when he was ordered by appellant to make right or left turns.

At one point, appellant reached over and jerked the steering wheel with his left hand. Bass said, " 'You know, you could kill us.' " Appellant said,

" 'We got to take care of the vehicle. We've got to get rid of it,' " and " 'I'll buy you a new one, whatever you want.' "

Appellant directed Bass to park in front of a closed restaurant next door to a convenience store. Appellant told Bass to walk into the store while appellant walked 10 feet behind, clicking the hammer on the gun. Appellant demanded some money from Bass and bought a candy bar.

Appellant pointed the gun at a dumpster and spoke of shooting off the gun or going to get somebody. Bass told appellant not to do that because a bullet might ricochet back.

Bass went back and got in the car. Appellant remained outside, and after seeing appellant walk around to the back of the building, Bass drove to the street. Bass then saw appellant, who had come around the building. Appellant pointed a gun at Bass and said, " 'You are lucky you weren't being a Dick to me.' " Bass said that he was not, and appellant got into the car and was holding the gun across his lap. Appellant rambled on about getting rid of the witnesses and getting rid of the car.

Appellant gave a few more directions then got out of the car after acting as if he had thrown something under the seat. Appellant still held the gun and closed the door. Bass drove over to a 7-Eleven and called 911. Bass told the dispatcher in which direction appellant was headed. When the police arrived, Bass told them what had happened that night.

Bass had not wanted to be in the car with appellant that evening, but he was scared because of appellant's gun. Bass did not know what to do because he could not just push someone with a gun out of the car. Bass did not see appellant consume any drugs or alcohol that evening. Bass was familiar with the effects of amphetamines or methamphetamine on individuals because he knew people who used those drugs. Bass testified that appellant did not appear to have symptoms of such use, but rather appeared to be in complete control.

During the early morning hours of January 15, 1989, John E. Jones of the Ontario Police Department received a radio call regarding a man with a gun who was suspected of firing into a car. Jones was given a description of the suspect, his location and direction of travel.

Jones saw appellant, standing with his arms closed with both of his hands up tightly to his armpits. Jones could not tell if appellant held something in his hands.

After Jones turned his vehicle around, he saw appellant standing still with his back to Jones, but in a different spot. After leaving the police vehicle, Jones asked appellant to turn around and unfold his hands and put them on the hood of the patrol car. Jones saw the back strap and wooden handle of a gun coming out from appellant's armpit. Jones saw the hammer of the gun coming out and the barrel of the gun beginning to come towards his direction.

Jones fired one shot at appellant and struck appellant with the bullet. Appellant's only statement was, " 'I didn't shoot anybody. I didn't shoot anybody.' "

B. *Defense case*

Appellant's defense was manslaughter and imperfect self-defense based on voluntary intoxication which had caused appellant's deteriorating mental condition and impaired his ability to think.

During trial, the court limited defense testimony regarding the development of appellant's paranoia and mental depression months before the shooting. Defense counsel made an offer of proof that lay testimony about appellant's depression and drug intoxication would be the basis for expert medical testimony regarding appellant's mental state and mental disorder at the time of the shooting. Thereafter, the court modified its order and allowed appellant to present testimony about appellant's drug use and mental disorder.

David Streety testified that he and appellant had known each other since high school. Appellant had started working at Streety's garage four to five months prior to the shooting. In late 1988, appellant began taking speed on a daily basis, became progressively paranoid and claimed people were following him in cars. Appellant's drug use got out of control about the same time as appellant purchased a gun.

Appellant's mother testified that appellant was hyperactive in grammar school and received ritalin medication until age 15. She was forced to get a restraining order in October 1988, when appellant started using excessive amounts of drugs and acting violent. Appellant's drug use became much more pronounced after his girlfriend left him and took their baby.

Officer Alfredo Parra testified that on September 26, 1988, he was called to assist appellant who was found screaming, shouting, and shaking on a public sidewalk. Appellant claimed that electricity was shooting up from

the ground and shocking him. Appellant was taken to the Ontario Community Hospital.

Dr. Greg Maddex testified that he examined appellant at the hospital emergency room after appellant was subdued with police taser darts. Appellant was combative, talking in fragmented sentences, and writhing about the table. Appellant had no grasp of reality; his urine tested positive for amphetamines. Appellant was transferred to San Bernardino County Hospital for a psychiatric evaluation pursuant to Welfare and Institutions Code section 5150.

Rochelle Garant testified that she had known appellant for 10 years. Appellant's girlfriend taking their baby caused him to become depressed, and appellant started using speed and cocaine on a regular basis. As a result of his drug consumption, appellant became paranoid and thought people were following him. During January 1989, appellant smoked and snorted excessive amounts of speed and was not sleeping or eating.

Clifford Delasantos testified that he had known appellant for 10 years. On the evening of January 14, 1989, appellant consumed half a gram of methamphetamine and was acting paranoid just before leaving Delasantos's residence.

Richard (Skip) Reeves testified that he met appellant at his grandmother's house on January 14, 1989. They stayed until 11 p.m. and consumed methamphetamine. Appellant and Reeves decided to go see Richard's sister, Dawn Reeves. On the ride over, appellant smoked a quarter gram of methamphetamine. Appellant was paranoid and "wigged out" (i.e., not in a right state of mind) at Dawn's apartment.

Timothy Clark testified that on the night of January 14th, appellant was fidgeting around in the apartment, that it was apparent something was wrong with appellant and that appellant was acting crazy and like a lunatic.

Dawn Reeves testified that appellant was very quiet and kept to himself at the apartment on the night in question and that appellant was walking very paranoid, i.e, he kept walking to the window, looking out, sitting back down and then getting up and looking out the window again.

Dr. Ronald E. Siegel testified that he is a psychopharmacologist who researches the effects of drugs on humans. According to Dr. Siegel, a person who takes amphetamine for a long period of time progresses through four distinct stages. The third stage is paranoia, which progresses into psychosis

in the fourth stage. Paranoid hallucinations and delusions are present in the fourth stage.

Dr. Siegel reviewed appellant's case. Siegel reviewed the police reports, public defender's investigation report, preliminary hearing transcript, some of appellant's records from Ontario Hospital, the toxicology report and the autopsy report. Siegel interviewed appellant and took a detailed history of the drugs used by appellant and how the drugs affected appellant's perceptions.

Ms. Linda Wong, the forensic toxicologist who analyzed the blood samples taken from appellant following his arrest, testified that his blood tested positive for methamphetamine (320 nanograms per milliliter) and amphetamine (68 nanograms per milliliter). Dr. Siegel testified that those blood levels constituted a high concentration of methamphetamine—about 10 to 15 times the amount normally used for therapeutic purposes.

Dr. Siegel recounted an interview with appellant in which appellant gave a confused account of the night of the shooting. Appellant told Dr. Siegel that he believed that the driver of the other car was his father-in-law and wearing a cowboy hat and that he had fired the revolver based on a belief that he and Bass were about to be the victims of a drive-by shooting. Siegel was of the opinion that appellant was intoxicated with methamphetamine on the night of the shooting, experienced a paranoid psychotic episode and was hallucinating at the time of the shooting.

## CONTENTIONS

1. The court failed to fully instruct the jury on defense issues of intoxication, imperfect self-defense and nonstatutory manslaughter.

2. Defense evidence presented during the trial regarding appellant's drug intoxication and psychotic paranoia required the court to instruct on involuntary manslaughter.

3. The court committed prejudicial error when it failed to instruct on involuntary manslaughter as a necessarily included offense to murder.

4. The court erred as a matter of law when it rejected defense instructions regarding voluntary intoxication and unconsciousness.

5. The court committed prejudicial error when it instructed the jury that voluntary manslaughter is a general intent crime for which appellant's voluntary intoxication was not a defense.

6. The prosecution's failure to disclose and produce appellant's prior arrest reports before trial and prior to sentencing violated appellant's due process right to a fair trial.

7. No California Rules of Court, rule[2] 421 aggravating factors existed to warrant imposition of an upper three-year term on the false imprisonment conviction.

8. The court violated *In re Culbreth* (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23] when it used a section 12022.5 firearm enhancement in a dual fashion to first impose an upper term on the false imprisonment sentence and then to impose two separate two-year consecutive sentences.

9. The court committed error pursuant to sections 654 and 669 when it ordered the false imprisonment and second degree murder sentences to run consecutive to one another.

10. The abstract of judgment incorrectly orders appellant's determinate sentence to run consecutive to the indeterminate sentence for second degree murder.

DISCUSSION

I. *The Court Improperly Failed to Instruct on Involuntary Manslaughter*

In the instant case, appellant was convicted of second degree murder based on a drive-by shooting into another vehicle. The defense theory of the case was that appellant committed the offense in self-defense based upon an unreasonable belief that he was going to be the victim of a drive-by shooting and that appellant's belief resulted from his drug intoxication leading to a paranoid hallucination. The jury was instructed on first and second degree murder and voluntary manslaughter as well as mental disease or defect, voluntary intoxication and unreasonable self-defense. The court rejected defense's proferred involuntary manslaughter instruction, CALJIC No. 8.47 (1979 rev.).

This case is closely analogous to *People v. Ray* (1975) 14 Cal.3d 20 [120 Cal.Rptr. 377, 533 P.2d 1017], a case in which the Supreme Court reversed a voluntary manslaughter conviction because the trial court had failed to instruct on involuntary manslaughter. In *Ray*, the jury had been instructed

---

[2] All rule references are the California Rules of Court.

on first and second degree murder and voluntary manslaughter and diminished capacity as it related to those crimes. (*Id.*, at p. 27.)

The court observed that the general principles relative to the duty to instruct sua sponte were "an obligation to instruct on [a defense] but only when it appears that the defendant is relying on that defense, 'or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " (14 Cal.3d at p. 25.)

In *Ray*, the court observed that there was no factual support for the defense of involuntary unconsciousness in the record, the defendant had raised the defense for the first time on appeal and the instruction was inconsistent with the complete defense asserted at trial that the defendant killed only in self-defense. (14 Cal.3d at pp. 25, 27.)

But then, the court noted that the trial court's failure to instruct on involuntary manslaughter was due to a misunderstanding that a state of unconsciousness was necessary to a finding of involuntary manslaughter in the context of diminished capacity based on intoxication. (14 Cal.3d at p. 28.) The court reasoned that: "Notwithstanding the absence of substantial evidence to support defendant's claim of unconsciousness, the refusal of the trial court to instruct on involuntary manslaughter in the context of diminished capacity eliminated an opportunity for defendant to have been found guilty of a crime not more serious than involuntary manslaughter." (*Id.*, at p. 27.)

The court noted that: "The unlawful killing of a human being with malice aforethought is murder. (§ 187, subd. (a).) If because of diminished capacity the perpetrator is unable to entertain malice but nevertheless is found to be able to form the intent to kill the crime is voluntary manslaughter. If because of his diminished capacity he additionally did not intend to kill, his crime, if any, is involuntary manslaughter. [Citation] . . . 'Once facts are adduced which would constitute a basis for finding that defendant had both diminished capacity . . . , and also unconsciousness or lack of the intent to kill, the trial court fails in its duty to instruct the jury as to all issues of law raised by the evidence . . . if it does not supplement the statutory definition of involuntary manslaughter. It must also instruct that if, due to diminished capacity the defendant had neither malice nor intent to kill, the offense could be no greater than involuntary manslaughter.' " (Italics deleted.) (14 Cal.3d at p. 28.)

The court held that it was *"clear that an instruction on involuntary manslaughter is required if there is evidence that the accused is unable to entertain an intent to kill* even though he has not lapsed into unconsciousness."

(Italics added.) (14 Cal.3d at pp. 28-29.) The court concluded that although the trial court was correct in refusing the instruction based on unconsciousness, the court was required, sua sponte, to give proper instructions[3] on involuntary manslaughter in the context of diminished capacity due to defendant's voluntary intoxication because the weight of the evidence of defendant's intoxication was sufficient for a jury to have believed that although he was conscious, he lacked both malice and an intent to kill. (*Id.*, at p. 31.)

 In a supplemental brief and in the petition for rehearing, respondent implies that *Ray* should not form the basis for the ruling in the instant case because diminished capacity is no longer viable law in California to the extent that it was at the time *Ray* was decided. Although diminished capacity is no longer a complete defense, pursuant to section 22, subdivision (b), rebuttal evidence must still be considered by the trier of fact in determining whether a defendant actually formed malice or the intent to kill. (*People* v. *Molina* (1988) 202 Cal.App.3d 1168, 1172-1174 [249 Cal.Rptr. 273].) "[W]hether the defendant had or did not have the required mental states shall be decided by the trier of fact." (§ 29.)

Accordingly, *Ray* is still good law in its holding that where there is substantial evidence that a defendant was unable to entertain, i.e., did not actually form, an intent to kill, the court has a sua sponte duty to instruct on involuntary manslaughter.

The question then becomes what type of evidence constitutes substantial evidence that a defendant did not actually form an intent to kill. Respondent argues that there is no evidence that appellant's hallucinations played a part in his mental state at the time of the shooting and that appellant's defense is factually inconsistent with a claim that appellant was unable to form an intent to kill. We disagree.

Under *Ray*, there has to be evidence of two factors—a sort of cause and effect relationship between intoxication and lack of intent to kill. Even though Ray's defense was also self-defense, the court determined that there was sufficient evidence of a lack of an intent to kill. The sufficient evidence in *Ray* was that: "Defendant and others testified that he had taken a number of 'reds' (secobarbital) during the day of the killing, and there was expert testimony to the effect that analysis of specimens taken from defendant on the day of the killing disclosed .15 milligrams percent of secobarbital in defendant's bloodstream. According to the testimony of an expert witness

---

[3] For an example of the type of instruction which could be adapted to this case see *People* v. *Conley* (1966) 64 Cal.2d 310, 324, footnote 4 [49 Cal.Rptr. 815, 411 P.2d 911].

such a drug level in conjunction with a concussion of the brain would result in difficulty in thought transmissions and in the formation of sound judgments. Several lay witnesses testified that defendant appeared dazed at the times of the encounters." (Fn. omitted.) (14 Cal.3d at p. 25.)

We imply from *Ray* that a lack of an intent to kill may be indicated by evidence that a defendant was acting like an automaton, robot-like or in a trance or dazed, i.e., that the body was moving without the mind.

In *People* v. *Molina, supra,* 202 Cal.App.3d 1168, the defendant was found guilty of second degree murder and found not guilty by reason of insanity and committed to the department of mental health for killing her infant son by stabbing him repeatedly in the heart. Although the trial court had permitted evidence of her ability to form the requisite mental states to be introduced, it had refused to instruct on voluntary and involuntary manslaughter. The appellate court concluded that evidence of defendant's mental illness presented a factual issue if she could form malice and intent to kill, and therefore voluntary and involuntary manslaughter instructions should have been given. (*Id.,* at p. 1175.)

In *People* v. *Jackson* (1989) 49 Cal.3d 1170, 1196 [264 Cal.Rptr. 852, 783 P.2d 211], the court held that given the defendant's testimony that he had no memory of the shooting and the expert testimony on the effects of PCP on a chronic user, the trial court had a sua sponte duty to instruct, as it had done, on both voluntary and involuntary manslaughter.

In this case, there was substantial evidence regarding appellant's intoxication due to drug use. Both Clifford Delasantos and Richard Reeves testified to the fact that appellant consumed methamphetamine on the night of the shooting. Other witnesses testified about appellant's past use of drugs, their effect on him and the amount of methamphetamine found in his bloodstream following his arrest.

Expert testimony was received on the effects of appellant's long term drug use. Dr. Siegel stated that the amount of methamphetamine found in appellant's blood samples was a high concentration of methamphetamine—about 10 to 15 times the amount normally used for theraputic purposes. In Siegel's opinion, appellant was intoxicated with methamphetamine on the night of the shooting, experiencing a paranoid psychotic episode and hallucinating that he was about to be the victim of a drive-by shooting.

Bass testified that appellant exhibited bizarre behavior—that appellant rambled in his speech, rocked back and forth in the car seat, and was "out of it." Although Bass testified that appellant "was in complete control,"

during cross-examination Bass admitted that he probably told the 911 dispatcher whom he called after he got away from appellant that appellant was crazy, "out of it," "nuts," and " 'crazy with a Capital C.' "

Detective Holzberger conducted a detailed two-hour interview of Bass shortly after the shooting. Bass told Detective Holzberger that appellant was acting crazy, "spaced out," and "freaking out."

Several witnesses testified that prior to abducting Bass, appellant had been acting peculiarly. According to Richard Reeves, appellant was paranoid, "sketching" (i.e., one who is always looking behind his back, cannot stop moving or is being paranoid) and "wigged out" (i.e., not in a right state of mind) just before appellant abducted Bass. Dawn Reeves testified appellant acted unusual in her apartment, very paranoid. Bass testified that prior to his abduction, Dawn had warned him that appellant looked "wierded [*sic*] out, wigged out," and high on drugs.

The testimony here is similar to the testimony in *Ray* that Ray was dazed in that it suggests that appellant did not know what he was doing, that his body was moving without his mind. Appellant's behavior and his history of drug use and ingestion of an excessive amount of methamphetamine on the night of the shooting presented a factual question for the jury regarding whether appellant was able to actually form the intent to kill. Respondent argues that the factual question regarding appellant's intent was resolved adversely to him by the jury's finding him guilty of second degree murder.

In *People* v. *Roberts* (1975) 51 Cal.App.3d 125, 133 [123 Cal.Rptr. 893], and *People* v. *Matta* (1976) 57 Cal.App.3d 472, 482-484 [129 Cal.Rptr. 205], the courts determined that the failure of the respective trial courts to give the diminished capacity-involuntary manslaughter instruction while error, was not prejudicial error because the jury in convicting the defendants of second degree murder, impliedly found malice aforethought, which impliedly determined the factual question presented by the missing instruction adversely to defendant under properly given instructions.

In *Matta*, the court noted that in *Ray* the jury had convicted Ray of voluntary manslaughter. The *Matta* court reasoned that the jury there had impliedly found malice aforethought because it had convicted the defendant of second degree murder, which meant that the jury had chosen to reject the evidence of diminished capacity as negating malice. (57 Cal.App.3d at pp. 482-483.) However, involuntary manslaughter instructions were given in both *Matta* and *Roberts*, while in the instant case, no involuntary manslaughter instruction was given.

■ Furthermore, although the court in *Ray* noted that the defendant had been convicted of the least severe crime, it went on to state that: "In any event an erroneous failure to instruct on a lesser included offense constitutes a denial of the right to have the jury determine each material issue presented by the evidence, and such error cannot be cured by weighing the evidence in an effort to determine that it would not be reasonably probable that a correctly instructed jury would have convicted defendant of the lesser included offense." (*People* v. *Ray, supra,* 14 Cal.3d at pp. 31-32.) ■ Therefore, we conclude that the question of appellant's intent to kill was not resolved by the jury as it did not have the full range of applicable lesser included offenses offered to it.

Accordingly, we conclude that the trial court here erred in not giving a proper involuntary manslaughter instruction as delineated by *Ray*. However, although the failure to give an involuntary manslaughter instruction was prejudicial, the failure infected only the second degree murder conviction, not the lesser included offense of involuntary manslaughter. We note that appellant's defense was manslaughter and unreasonable self-defense. Thus, there was no question at trial that appellant killed Zacharis; therefore, we will reverse with directions to enter a judgment of guilty of involuntary manslaughter if the prosecutor agrees or to set the cause for retrial if the prosecutor does not so consent. (See *People* v. *Riederer* (1990) 217 Cal.App.3d 829, 836-837 [266 Cal.Rptr. 355].)

Since we reverse the second degree murder conviction based on an instructional error, we will not address appellant's other alleged instructional errors. Accordingly, we now turn to appellant's other contentions. Even though appellant will have to be resentenced should the prosecutor decide not to retry the case, we will assume that the prosecutor will decide not to retry this case in order to discuss appellant's other contentions, including his contentions regarding the sentencing pertaining to both crimes.

II. *The People Provided Proper Discovery, and the Court Used Appropriate Reports in Sentencing Appellant*

A. *There was no error in allowing the use of the prior arrest report during trial*

■ Appellant contends that the trial court committed prejudicial error when it allowed the prosecution to cross-examine David Johnson, a defense character witness, about appellant's 1981 juvenile arrest for battery on a police officer. The prosecutor asked Johnson if he knew that appellant had been shot by a police officer who was acting in self-defense when appellant was beating the officer with a stick. Johnson, who had not known appellant

in 1981, testified that he had heard that appellant had been shot, but did not know any of the details of the incident.

Appellant claimed surprise and objected to the fact that the arrest report had not been disclosed prior to trial. The court noted that Johnson was being examined regarding appellant's reputation for violence in the community and that the discovery request did not request any history of possible acts or threats of violence by appellant. The court noted that the prosecution could not use the evidence in its case-in-chief and then overruled appellant's objection.

Appellant claims that section 859 requires the prosecution to deliver or make accessible all "police, arrest, and crime reports" regardless of whether the information was requested in a formal discovery order. Appellant was provided a copy of the investigation report of the 1981 arrest during the argument about the use of that report. Appellant argues that the court's denial of appellant's continuance request and its failure to compel midtrial discovery of all prior arrest reports denied appellant's due process right to a fair trial on the issues of guilt and punishment, especially since the prosecution lodged five prior arrest reports at the time of sentencing.

 █ █ Even though the trial court has the inherent power to order discovery when the interests of justice so demand (*Holman* v. *Superior Court* (1981) 29 Cal.3d 480, 483 [174 Cal.Rptr. 506, 629 P.2d 14]), appellant did not make a motion for discovery midtrial nor has he provided any authority[4] as to why the court should have sua sponte ordered midtrial discovery.

Appellant cites no authority for his proposition that section 859 requires the prosecution to disclose all police, arrest and crime reports relating to a defendant rather than the reports of the current or charged offenses. The language of the statute suggests that only the reports relative to the current charges must be produced. We note that in *People* v. *Aguirre* (1987) 193 Cal.App.3d 1168, 1171 [238 Cal.Rptr. 750], the court in addressing the defendant's contention regarding the failure of the prosecutor to provide reports pursuant to section 859, refers to reports bearing directly on the instant charges. The purpose of the statute is for the defendant to secure and be represented by counsel at the preliminary hearing before the judge begins the examination. (*People* v. *Terry* (1962) 57 Cal.2d 538, 554 [21 Cal.Rptr. 185, 370 P.2d 985].) Since the purpose of the preliminary hearing is to weed out groundless charges (Witkin, Cal. Criminal Procedure (1963)

---

[4] " 'Where a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion.' " (*People* v. *Dougherty* (1982) 138 Cal.App.3d 278, 282 [188 Cal.Rptr. 123].)

§ 132, pp. 127-128; *id.* (1985 supp. pt. 1) at pp. 168-169), it would not be necessary for a defendant's attorney to have the defendant's entire criminal history at this point in the legal process.

Appellant cites *In re Ferguson* (1971) 5 Cal.3d 525, 532 [96 Cal.Rptr. 594, 487 P.2d 1234], for the proposition that in some circumstances, the prosecution must, without request, disclose substantial material evidence *favorable* to the accused. ■ It is true that the prosecution has a duty to disclose all material evidence favorable to a defendant, including evidence relating to guilt, punishment, and the credibility of witnesses. (*People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341].)

The *Ruthford* court noted that for the failure to disclose to be reversible error, the defendant must make a showing of substantial materiality of the undisclosed evidence. (14 Cal.3d at p. 409.) In *Ruthford*, the suppression of substantial material evidence bearing on the credibility of a key prosecution witness was held to be a denial of due process within the meaning of the Fourteenth Amendment. (*Id.*, at p. 408.)

■ We conclude that evidence of appellant's prior arrest for battery on a police officer does not fall into the category of favorable evidence. We note that appellant makes no attempt to discuss why this information was favorable to him or why the evidence was material much less substantial. (See *In re Ferguson, supra*, 5 Cal.3d at pp. 532-534.) Johnson was one of many defense character witnesses, and he was questioned only briefly about the arrest since he knew very little about the incident other than rumor. The report was not substantially material.

■ Appellant also argues that his rap sheet information should have been provided regardless of whether it was listed in the discovery order. A discovery request must specify the material sought and furnish a plausible justification for inspection. (*Joe Z.* v. *Superior Court* (1970) 3 Cal.3d 797, 804 [91 Cal.Rptr. 594, 478 P.2d 26].) Moreover, the defendant must also offer an explanation as to why he could not obtain the factual information sought directly from the source. (*Id.*, at p. 806.) Accordingly, appellant's suggestion that his rap sheet information should have been provided is without merit since sections 11105, subdivision (b)(8) and 11120-11126 provide the means by which a defendant's attorney can obtain the defendant's rap sheet information. There is no reason for a prosecutor to do defendant's work for him.

B. *The trial court's reference to appellant's prior arrest reports at the time of sentencing was proper*

■ Appellant contends that the trial court erred at sentencing by considering arrest reports of five previous arrests of appellant as he did not have

an opportunity to challenge the validity of the reports. Citing *People* v. *Calloway* (1974) 37 Cal.App.3d 905 [112 Cal.Rptr. 745], appellant argues that the reports could not be properly considered because they were not part of the probation report, and if the reports were used as a statement in aggravation, copies should have been served at least four days prior to the sentencing hearing pursuant to California Rules of Court, rule 437.

*Calloway* held that records of police contacts relating to crimes with which a defendant is neither convicted nor charged should not be included in a probation report without supporting factual information. (37 Cal.App.3d at pp. 908-909.) The reports at issue here are the arrest reports themselves. The court indicated that it had read each report and decided what, if any, relevancy each report had to the crimes of which appellant had been convicted.

In relevant part, section 1170, subdivision (b) provides that: "In determining whether there are circumstances that justify imposition of the upper or lower term, the court may consider the record in the case, the probation officer's report, *other reports* including reports received pursuant to Section 1203.03 and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, . . . and any further evidence introduced at the sentencing hearing." (Italics added.)

Rule 437(a) requires that statements in aggravation shall be filed and served at least four days prior to the sentencing hearing. Arrest reports are not statements in aggravation as can be seen from rule 437(c)'s requirements regarding the contents of a statement in aggravation. Therefore, the four days notice does not apply to the use of the arrest reports, and we conclude that the trial court committed no error in referring to the arrest reports at the time of sentencing.

III. *The Trial Court Committed No Sentencing Errors*

A. *The court cited proper factors to justify imposing the upper term on the false imprisonment conviction*

Appellant contends that the court relied on a number of improper rule 421 factors to impose an aggravated sentence and that the facts do not support the court's stated reasons for imposing the upper term on the false imprisonment conviction.

When imposing sentence on the false imprisonment conviction, the court stated that: "This crime was aggravated and that it involved great violence, great bodily harm, and threat of great bodily harm and a high degree of

cruelty as pursuant to section 421 of the rules of court. The crime involved multiple victims. It is a random crime where the victim is particularly vulnerable, and for that reason, on the 136 [*sic*] charge, he is sentenced to the upper of term of three years." The court noted that there were no factors in mitigation.

Rule 421(a) lists circumstances in aggravation. Among the factors listed are: "The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness or callousness"; "The defendant was armed with or used a weapon at the time of the commission of the crime"; and "The victim was particularly vulnerable"; and "The crime involved multiple victims."

■ The court has an obligation to convince itself that, when compared to other ways in which such a crime could be committed, the manner of the instant crime's commission indicated viciousness and callousness. (*People* v. *Harvey* (1984) 163 Cal.App.3d 90, 117 [208 Cal.Rptr. 910].) " 'The essence of "aggravation" relates to the effect of a particular fact in making the offense distinctively worse than the ordinary.' " (*Ibid.*)

■ Appellant argues that the court's findings are not supported by the record in that the offense did not involve great violence or multiple victims, Bass conceded that appellant had not threatened to kill him verbally nor threatened him with the gun, no great bodily harm was inflicted on Bass, no high degree of cruelty was involved, and the crime was not a random crime with a vulnerable victim because it was Bass who pushed appellant outside the apartment and drove appellant wherever appellant wanted to go. It is true that Bass was not injured nor were there multiple victims of the offense of false imprisonment. However, we conclude that the facts do support the court's findings that the crime involved a threat of great bodily injury, which disclosed a high degree of cruelty, and a vulnerable victim.

■ We recognize that: "As defined in section 236, 'False imprisonment is the unlawful violation of the personal liberty of another.' Without more, the conduct described in section 236 is a misdemeanor offense. (§ 237.) If effectuated by 'violence, menace, fraud or deceit,' false imprisonment is elevated to a felony. (§ 237.)" (*People* v. *Henderson* (1977) 19 Cal.3d 86, 93 [137 Cal.Rptr. 1, 560 P.2d 1180].) Pursuant to rule 441(d), since violence or menace are elements of felony false imprisonment, they may not be considered as factors in aggravation. (*People* v. *Flores* (1981) 115 Cal.App.3d 924, 927 [171 Cal.Rptr. 777].) Accordingly, great violence is necessary in order to be used as a factor in aggravation.

In *People* v. *Collins* (1981) 123 Cal.App.3d 535, 539 [176 Cal.Rptr. 696], the court observed that: "one who holds a cocked gun to his victim's head

over a period of several hours is significantly more culpable than one who merely points the weapon at the victim." The court reasoned that such facts were indicative of viciousness and callousness. (*Ibid.*) ██ In this case, although Bass initially offered to take appellant somewhere, he was forced under the threat of being shot to aimlessly drive appellant around, obeying appellant's commands to make right or left turns, run red lights, and speed up or slow down. Even though appellant may not have verbally threatened to shoot Bass, appellant's pointing his gun at Bass during this time constituted a threat. These facts indicate an attitude of cruelty and viciousness or callousness on appellant's part. Bass testified that he was scared of appellant because of the gun. Not only had Bass seen appellant choking and threatening Tim Clark earlier in the evening, but also Bass was forced to observe a killing. The facts of this case go beyond the use of the gun to deprive Bass of his freedom.

Moreover, Bass was a vulnerable victim. "Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act." (*People* v. *Huber* (1986) 181 Cal.App.3d 601, 629 [227 Cal.Rptr. 113].) Bass was occupied with driving his car, which had a manual transmission, on city streets at appellant's directions at gunpoint, exposing Bass to the risk of a traffic accident. Appellant attempted to involve Bass in two possible murders. Had appellant been able to shoot the sheriff's officers and had they been chased, then Bass would have been vulnerable to being perceived as an accomplice to appellant or to any attack upon the car. Thus, Bass was defenseless, accessible and susceptible to appellant's criminal act.

Appellant argues that *In re Culbreth, supra,* 17 Cal.3d 330, and rule 441(b) and (c) prohibit the dual use of a gun enhancement as an aggravating factor. Although the court cited appellant's gun use as an aggravating factor, the use of the same fact to enhance and to aggravate is harmless when there are other factors in aggravation. (*People* v. *St. Germain* (1982) 138 Cal.App.3d 507, 524-525 [187 Cal.Rptr. 915].) As already discussed, there were other factors in aggravation and no factors in mitigation in this case. Accordingly, we conclude that there were sufficient facts to justify the imposition of the upper term on the false imprisonment sentence.

B. *There was no error in imposing two consecutive terms based on the firearm use enhancements*

██ Since we have given the prosecutor the option of retrying this case or accepting the involuntary manslaughter conviction, we will discuss

appellant's contention that the court erred when it imposed two separate and consecutive terms based on an assertedly single firearm use enhancement because the sentence violated the single occasion rule of *In re Culbreth, supra,* 17 Cal.3d 330.

The jury found the gun use enhancements to be true with respect to both offenses. The court found that the two offenses were "totally and completely separate," that before Zacharis was shot, he was not even a thought in appellant's mind, and that Bass was falsely imprisoned for reasons known to appellant at that time long before Zacharis came on the scene. The court's implied determination that the false imprisonment and murder did not constitute an indivisible course of conduct is supported by the evidence adduced at trial. (*People* v. *Green* (1985) 166 Cal.App.3d 514, 518 [212 Cal.Rptr. 451].)

Appellant argues that under *In re Culbreth, supra,* 17 Cal.3d 330, 333-334, a firearm use enhancement can only be used once if there was a single or indivisible action because the purpose of section 12202.5 is to deter the use of firearms on subsequent occasions. The court reasoned that a defendant may not avoid additional penalties by claiming that a series of divisible acts, each of which had been committed with a separate identifiable intent and objective, composed an indivisible transaction. (*Id.,* at p. 333.) On the other hand, if all the charged offenses are incident to one objective and effectively comprise an indivisible transaction, then section 12022.5 may be invoked only once and not in accordance with the number of victims. (*Id.,* at pp. 333-334.) In *Culbreth,* the court concluded that there was a single transaction and single objective, i.e., "a single frenetic act of violence," where the defendant shot three victims in a matter of seconds. (*Id.,* at pp. 334-335.)

██ There is a single occasion absent any meaningful separation in time or the emergence of a criminal objective unrelated to the defendant's primary criminal enterprise. (*People* v. *Levitt* (1984) 156 Cal.App.3d 500, 512-513 [203 Cal.Rptr. 276].) As noted by the court in *People* v. *Raby* (1986) 179 Cal.App.3d 577, 586-591 [224 Cal.Rptr. 576], there is no clear line dividing which circumstances are considered a single transaction and which circumstances are considered separate transactions.

██ The two crimes at issue here occurred during the same time since while appellant falsely imprisoned Bass, he killed Zacharis. However, we cannot say that these two acts constituted one continuous transaction. De-

spite appellant's claim that the crimes were interrelated because he had his gun drawn at all times and because he told Bass that he was on a mission and that Bass was his wheel man, the objective in using the gun to deprive Bass of his freedom differs from the objective in using the gun to deprive Zacharis of his life. Appellant had time to pause and think of the consequences of his actions after Bass caused him to miss the opportunity to shoot the sheriff's officers. Since appellant's defense was self-defense based on his hallucination that he was going to be the victim of a drive-by shooting, he cannot convincingly argue that his objective in falsely imprisoning Bass was to kill another person.

Accordingly, we conclude that appellant had time out to pause and reflect on the penal consequences of each act and the motivations underlying the uses of the gun were unrelated to each other. (*People* v. *Raby, supra,* 179 Cal.App.3d 577, 586.) Therefore, the imposition of the two gun use enhancements, one for each offense, was proper.

■ Lastly, appellant contends that section 654 bars the use of consecutive sentences. Appellant argues that pursuant to section 654 and 669 and rule 425, since the false imprisonment was incidental to the murder, the false imprisonment sentence should have been ordered to run concurrent to the murder sentence. The court imposed consecutive sentences based on findings that the crimes were independent of each other and there was a vulnerable victim. As already discussed, we reject appellant's arguments that the court was wrong in finding that the crimes were independent of each other and that Bass was not a vulnerable victim. Accordingly, we conclude that section 654 does not bar the use of consecutive sentences.

As conceded by the People, the abstract of judgment incorrectly states that the determinate sentence for false imprisonment is to run consecutive to the indeterminate sentence for murder. (§ 669; *People* v. *Grimble* (1981) 116 Cal.App.3d 678, 684-685 [172 Cal.Rptr. 362].) However, since the case is being remanded for sentencing for involuntary manslaughter or retrial for second degree murder, there is no need to correct the abstract as under either option appellant will have to be resentenced.

## DISPOSITION

For the reasons stated, the judgment is reversed and the cause remanded to the superior court with directions to enter a judgment of guilty of involuntary manslaughter, if the prosecutor consents to forgo prosecuting

defendant for second degree murder, or to set the cause for retrial, if the prosecutor does not so consent.

Lillie, P. J., and Johnson, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 19, 1991.