Filed 3/18/13  P. v. De La Rosa CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>JORGE CORRALES DE LA ROSA,<br><br>   Defendant and Appellant. | 2d Crim. No. B237977<br>(Super. Ct. No. VA100841)<br>(Los Angeles County) |

Jorge Corrales De La Rosa walked into a barbershop and shot a rival gang member who was having his haircut.  De La Rosa appeals a judgment after the jury found him not guilty of murder, and guilty of voluntary manslaughter with personal use of a firearm.  (Pen. Code, §§ 192, subd. (a), 12022.5, subd. (a).)  The jury found not true a gang enhancement allegation.  (§ 186.22, subd. (b)(1)(C).)  The trial court sentenced De La Rosa to 21 years in state prison.

De la Rosa contends that the court had a sua sponte duty to instruct the jury on involuntary manslaughter because there was evidence that he did not have the intent to kill, he did not act with conscious disregard for human life, and he acted with an honest but unreasonable belief that lethal force was necessary for self-defense.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

De La Rosa is a member of the JBI ("Just Blazing It") gang. The 18th Street gang is JBI's rival. Until April of 2007, Magdaleno's Barber Shop was a neutral area in which rival members could have their haircut without confrontation.

Early in April, De La Rosa's brother put JBI graffiti on Magdaleno's awning. Then 18th Street members crossed out the JBI graffiti.

On April 8, 2007, JBI member Robert "Scrappy" Ramos went to Magdaleno's and had his haircut. Members of 18th Street were also present. Ramos testified that the 18th Street members gave him hostile looks. One 18th Street member who shared Ramos' nickname, "Scrappy" Diaz, removed his shirt and displayed a large 18th Street tattoo across his chest. Diaz sat across from Ramos and stared at him. Ramos testified that he felt threatened.

Ramos used his cellular phone to contact other JBI members and associates, including De La Rosa. When De la Rosa spoke to Ramos, he thought Ramos' voice sounded normal, but he thought that Ramos was in danger. De La Rosa wanted to get "manpower" to help Ramos.

According to De la Rosa, he and several other people who were associated with JBI gathered outside the barber shop. De La Rosa testified that he called Ramos and Ramos came out of the barber shop. But Ramos wanted to go back into the barber shop to confront Diaz. De La Rosa and the others thought this was a "stupid" plan and they tried to talk Ramos out of it. Ramos ignored them and went back into the barbershop. Ramos said, "Nobody told you guys to come." He seemed aggravated.

De La Rosa called a "friend" who told him to get Ramos out of the barber shop. De La Rosa tried to contact Ramos by phone, but this time Ramos ignored the phone. Someone gave De La Rosa a .40 caliber Glock handgun. He put it into his waistband and went into the barber shop to get Ramos.

De La Rosa testified that he did not plan to use or "even to brandish" the gun. He intended to sit next to Ramos and convince him not to carry out his plan. De La Rosa knew there were 18th Street members inside, including Diaz who was a

2

"powerful man."  But De La Rosa did not think they would recognize him as a JBI member.

De La Rosa said his decision to take the gun was "real quick."  He "debated whether [he] should go in with it or without it, and [he] went with."  He took it in case he needed it.  The "way [he] figured [was] if something occurs -- well, there are 18th Streeters inside."  He said, "I don't fear" 18 Streeters but they are "rivals."  He said his safety was "a concern."  He assumed the 18th Streeters were armed.

As De La Rosa entered the barbershop, he felt "slightly nervous, but confident" that nothing would happen.  He did not intend to kill anyone.  He intended to sit quietly by Ramos, but as he walked in, Ramos stood up.  De La Rosa "scold[ed]" Ramos, who said, "fuck that, just hold on."  Ramos turned away from De La Rosa and walked toward a group of people that included Diaz. De La Rosa testified that he saw Ramos reach into his sweater.  De La Rosa "put two and two together" and shouted, very loud, "Scrappy, What the fuck?"  Then De La Rosa realized "it was stupid [what he] had done."  De La Rosa said that by shouting he had "caused everybody to direct their attention to me or us."  That is when "everything occurred."

According to De La Rosa, an 18th Street member "jumped off the barber chair."  De La Rosa later learned this was "Cano."  De La Rosa drew his gun when Cano looked at him.  He testified that he saw Cano "debating . . . what to do.  And he looks at me and that . . . is when I'm drawing the gun."  And as Cano walked toward him, De La Rosa "chambered it."  De La Rosa did not want to use the gun, but he thought chambering it was "the best thing to do."  He said chambering a gun, "scares -- . . . it's just about right, yeah, I wouldn't have mind[ed] scaring them, keeping them away, you know, stay away from me at least."

Cano was wearing a smock.  It happened "very fast."  Cano "rushed" him. De La Rosa, "just assumed he's -- he's going to have a gun under that smock.  He's pulling out his gun."  He did not see Cano's hands.  The smock looked "normal[]."

Cano "jumped" him and they struggled.  De La Rosa feared for his safety when Cano attacked him.  Cano held De La Rosa's shirt, hit him, and tried to take the

3

gun away. De La Rosa thought, "if this guy manages to take the gun, I'm dead." He did not "initially" try to shoot Cano. He thought someone would "pop a gun out behind [his] back." De La Rosa panicked. He said, "during all this time shots are going off." He did not want to shoot Cano. He hoped a miracle would happen. He thought, "He'll realize that I'm shooting and he'll let me go." He did not know if all the shots were from his own gun.[1]

De La Rosa broke away near the shop's exit and got into the driver's seat of his car. The engine was still running. He saw Cano leave in another direction. He heard shots fired from the barber shop, and then Ramos appeared. Ramos got into the car and the drove away. De La Rosa realized he had shot himself in the leg. He did not go to the hospital because he knew police would question him. He lived as "a fugitive" until he was caught three months later.

Investigators found that at least eight bullets had been fired from one .40 caliber Glock handgun in the barber shop. Four went through Cano's body. One of these entered his back and traveled in a downward trajectory. There were multiple .40 caliber fired cartridge cases inside the barber shop, one unfired, and there was one fired .40 caliber cartridge case outside the shop under Cano's truck. There was no physical evidence that any other firearm was fired.

The court instructed the jury that, if De la Rosa sincerely but unreasonably believed lethal force was necessary for self-defense, the crime was voluntary manslaughter, not murder. De la Rosa did not request, and the court did not give, an instruction on involuntary manslaughter.

The prosecutor argued that the killing was premeditated first degree murder because De La Rosa was in no danger, he entered the barber shop knowing there

---

[1] We focus on the version of events presented in De La Rosa's trial testimony, upon which his appeal is based. The eyewitness accounts contradicted De La Rosa's testimony. For example, one of the barbers testified that De La Rosa walked in, asked Cano who he was, took out a "gun," chambered a round, and started shooting at Cano. The barber said Cano did not lunge at De La Rosa until after De La Rosa fired the first shot.

were rival gang members inside, he armed himself in advance, and neutral witnesses testified that he shot Cano while Cano was still sitting in the barber's chair. The jury rejected this theory when it convicted De La Rosa only of voluntary manslaughter.

## DISCUSSION

### *Involuntary Manslaughter Instruction*

A trial court must instruct the jury on every lesser included offense that is supported by the evidence. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) Voluntary and involuntary manslaughter are lesser included offenses of murder. (*Ibid.*) An instruction on a lesser included offense must be given "only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense but not the greater, charged offense." (*Ibid.*) We resolve any doubts as to the sufficiency of the evidence to warrant instructions in favor of the accused. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.)

A defendant who kills in unreasonable self-defense may be guilty of voluntary manslaughter or involuntary manslaughter. This depends on whether he acts with intent to kill. That is, if he acts with intent to kill or conscious disregard for human life, the killing in unreasonable self-defense is voluntary manslaughter. (*People v. Blakely* (2000) 23 Cal.4th 82, 91.) But if he kills without intent to kill and without conscious disregard for human life, then the killing in unreasonable self-defense may be involuntary manslaughter. (*Ibid.*)

De La Rosa testified that he did not intend to kill Cano. Reasonable jurors could believe his testimony. But no reasonable juror could believe he acted without conscious disregard for human life. His own testimony establishes that he was aware that his conduct was highly dangerous. He entered a barbershop that he knew was full of rival gang members, who he assumed were armed. He "debated on how to go about it." After he "debated," he decided to arm himself before entering. Everything "occurred" because he shouted, very loudly, "Scrappy, what the fuck?" When Cano walked toward him, he pulled out his gun and chambered a round instead of retreating through the exit in which he was standing. He decided that chambering a round was the

5

right thing to do because it "scares" them and he would not mind scaring them. He said, "they had all the right to -- considering what was occurring they had all the right to start shooting as well . . . ." He did not claim that the gun fired accidentally. He said he did not intend initially to shoot Cano, but when they struggled he thought, "He'll realize that I'm shooting and he'll let me go." He fired the gun eight times. There is no evidence that he was in a "trance" or daze," like the heavily intoxicated defendant in *People v. Webber* (1991) 228 Cal.App.3d 1146, 1163. De La Rosa testified that he was "thinking." Before he went into the shop, he "debated" whether to take the gun. As Cano approached, he said "I'm thinking this guy is coming towards me and I 'm thinking I'm drawing my gun." He said chambering the gun was "just a reaction," but he "just thought it was the best thing to do." A reasonable jury could only conclude that he acted with conscious disregard for human life.

"[W]hen a defendant, acting with conscious disregard for life, unintentionally kills in unreasonable self-defense, the killing is voluntary, not involuntary manslaughter." (*Blakely, supra,* 23 Cal.4th at pp. 88-89.) De La Rosa was not entitled to an involuntary manslaughter instruction. "A party is not entitled to an instruction on a theory for which there is no supporting evidence." (*People v. Memro* (1995) 11 Cal.4th 786, 868.)

Even if we assume the evidence was sufficient to require an instruction on involuntary manslaughter, any error in failing to give the instruction was harmless. The jury found that De la Rosa "personally used" a firearm. By doing so, they found he intentionally fired or brandished the weapon, conduct that was inherently dangerous to human life in the circumstances. The court instructed them that "personal use" means "the defendant must have intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it." The "personal use" statute is designed to address intentional conduct that is dangerous to human life. It "addresses the pervasive and inherent escalation of danger which arises from the *defendant's act* of deployment. By merely bringing a gun 'into play,' the defendant removes impediments to its actual discharge and thus enhances the danger of

6

violent injury not only through an intentional act by the victim or a third party, but through an impulsive or inadvertent act by the defendant." (*People v. Granado* (1996) 49 Cal.App.4th 317, 327.) The jury was not likely to have come to a different conclusion if they had been instructed on involuntary manslaughter.

*Presentence Credit*

De La Rosa was entitled to 1865 days of presentence custody and conduct credit, as respondent concedes. The trial court gave De La Rosa 1658 days of presentence conduct and custody credit. De La Rosa was entitled to 1865 days of credit, consisting of 1622 days of custody credit (from arrest on July 6, 2007 to sentencing December 13, 2011) and 243 days of conduct credit (15 percent of 1622). (§§ 2900.5, subd. (a), 2933.1, subds. (a) & (c), 667.5, subd. (c)(1) & (8).) A reviewing court may correct presentence custody credit errors. (*People v. Acosta* (1996) 48 Cal.App.4th 411.)

DISPOSITION

We modify the judgment to award 1865 days of presentence custody and conduct credit, but otherwise affirm. The trial court shall amend the abstract of judgment accordingly and forward the amended abstract to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


GILBERT, P.J.


We concur:


YEGAN, J.


PERREN, J.

7

Michael A. Cowell, Judge

Superior Court County of Los Angeles

_____

Gideon Margolis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, Mark E. Weber, Deputy Attorney General, for Plaintiff and Respondent.