Filed 5/27/26  P. v. Garcia CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E083699 |
| v. | (Super.Ct.No. 16CR030235) |
| MARK JERRY GARCIA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Michael A. Knish, Judge.  Affirmed.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Mark Jerry Garcia of first degree premeditated murder and possession of a firearm by a felon. (Pen. Code, §§ 187, subd. (a), 189, subd. (a), 29800, subd. (a)(1); unlabeled statutory citations refer to this code.) Garcia argues that the trial court erred by (1) denying his motion to disqualify the San Bernardino County District Attorney's Office, (2) failing to instruct the jury on the "heat of passion" theory of voluntary manslaughter (§ 192, subd. (a)), and (3) applying an incorrect legal standard to deny his new trial motion. He also argues that the prosecutor committed misconduct by (1) failing to disclose a defense witness's felony convictions before eliciting that evidence on cross-examination, and (2) misstating the law regarding premeditation and deliberation in closing argument. We affirm.

## BACKGROUND

I.      *Trial evidence*

The victim in this case was Carlos Lujan. Lujan was a member of the South Fontana gang. Joseph R. was also a member of the gang, and he and Lujan were close friends. Joseph's nephew, Anthony S., was also a South Fontana member. Lujan, Joseph, and Anthony belonged to a clique within the gang called "The Hood Locos" or THL.

South Fontana had another clique called "Chingones" or CG. Garcia was a CG member, and he and Joseph were also close friends. Garcia went by the name "Killer." The CG and THL cliques were generally friendly with each other and got along.

2

A.    *The shooting of Lujan*

Joseph and Anthony lived in Fontana with several other family members. South Fontana gang members would often "hang out" at their house. The property had a main house and a smaller detached house in the backyard (the back house). The back house was a single room, 14 feet by 16 feet, and it contained a washer, a dryer, a mini refrigerator, a small desk, a queen bed, a twin bed, and two lawn chairs.

One night in June 2016, Joseph and his family were celebrating a birthday at his home. He and his friends were in the back house drinking. Joseph had also ingested some heroin and possibly ecstasy. Lujan was there, and his red Mustang was parked at the residence. Someone told Joseph that Garcia was at the front door, so he greeted Garcia there and took Garcia to the back house. Joseph had not invited Garcia that night, but Garcia was welcome there anytime. The back house was full of people, although Joseph could not remember exactly how many; he was "high," and the night was "blurry." Lujan was sitting on one of the beds. Garcia shook hands with everyone. Joseph went to stand in a corner of the room. Seconds later, he heard gunshots and turned around to see "sparks" around Garcia and Lujan's body lying on the bed. Garcia walked out of the room, jumped in a car, and "took off."

Anthony said that he was not in the back house when gunshots were fired. He was walking from the main house to the back house when he heard the gunshots. He then turned around and ran inside the main house.

The South Fontana gang had a "floater" gun that members passed around. Joseph saw Lujan with the floater gun a few days before the shooting. Six months after the

3

shooting, Anthony was arrested for an unrelated matter, and officers searched his and Joseph's home. They found the floater gun—a revolver—in the rafters of the carport.

B.     *Law enforcement interview of Joseph*

Officers interviewed Joseph the morning after the shooting at around 5:00 a.m. Joseph said that when Garcia arrived, he greeted everyone and shook their hands. Garcia shook Lujan's hand, gave "him a hug, backed away from him a little bit, just looked at him and then, fool just pulls out a gun and starts shooting." Joseph said that Garcia ran away and got into the passenger side of his car.

At another point, Joseph described the shooting as follows: "[W]e're just chilling right there, me and a couple of my friends and um … my friend Killer walks up. He's a CG. He walks in, like he had a blank look on his face. I said what's up fool. He said, you're with him. He just looks at [Lujan], pulls out a piece and shoots him, emptied the whole clip on him. Everybody started, like what fuck, what the fuck you doing? He takes off running and everybody just scatters." Joseph thought he heard six gunshots. He said that nobody shot at Garcia. Joseph did not know that Garcia was coming over until he arrived. Joseph thought that Garcia passed by the house and saw the red Mustang parked there.

C.     *Law enforcement interview of Garcia*

Officers arrested and interviewed Garcia in late June 2016, a few weeks after the shooting. Garcia initially said that he had "nothing to say" about the shooting, and he denied being at Joseph's that night. He eventually admitted that he went to Joseph's

4

home and ran into Lujan there. He did not know that Lujan was going to be there, and he did not go there with a plan to kill anyone.

There was some sort of "inner beef" going on between the CG and THL cliques. Garcia's friend "Tony" had been shot and killed "for no reason," and he went to Joseph's home to find out why "they" killed Tony. Before he died, Tony told Garcia that "they were coming for" Garcia.

When Garcia arrived at Joseph's, everyone was sitting around in the back house, and things were "normal." He shook some hands, including Lujan's. Lujan laughed at him, turned his back to Garcia, and turned around with a .22-caliber revolver. Lujan was standing up and fired a round. Garcia had a semiautomatic gun and fired back until his gun was empty. He was afraid of getting shot. He then drove away in his car. Garcia burned the clothes that he was wearing and threw his gun into the ocean.

D. *Forensic evidence*

Responding officers found Lujan lying on the twin bed in the back house. His legs were hanging over the side of the bed as if he had been sitting on the edge of bed. There were two bullet holes in the wall behind Lujan but no other bullet holes in the back house and no bullet holes or strikes on the other structures on the property. Investigators found six spent cartridge cases in the back house, all of the same caliber and fired from the same gun.

Lujan had six bullet entrance wounds—one on his left forearm, four on his shoulders or chest, and one on his lower abdomen. Blood loss from the gunshot wounds caused his death within minutes.

5

On the night of the shooting, investigators collected samples from the hands of Joseph, Lujan, and Anthony. All three of their samples tested positive for gunshot residue. The positive results meant that they either fired a gun, handled a gun, were in close proximity to a fired gun, or touched a surface that had gunshot residue on it. Assuming that they were within a few feet of a shooter in a small room, one would expect to find gunshot residue on their hands. Anyone within 10 feet of a discharged gun, particularly in front of the barrel, is potentially exposed to gunshot residue.

The large amount of gunshot residue on Lujan's hands was typical for a shooting victim. The amount tended to indicate that Lujan either fired a gun or was in front of a gun being fired at him. It was less likely that he merely handled a gun or touched a surface with gunshot residue on it.

Revolvers do not automatically eject bullet casings when they are fired. The shooter would need to eject the casings manually.

E.  *Defense witnesses*

At trial, Garcia called an officer from the Rialto Police Department who investigated a shooting roughly one week before the shooting in this case. The victim in that prior shooting, Anthony Abreo, was pronounced dead at the scene. Lujan was a person of interest in the investigation into Abreo's shooting. But officers never identified a suspect, and the shooting remained unsolved.

Garcia also called Jacob M., who was a member of the South Fontana gang. Jacob belonged to THL, like Lujan, Joseph, and Anthony. Jacob and Garcia were friendly acquaintances.

6

Jacob testified that he was in the back house when the shooting occurred. He had consumed three or four beers but was still clear minded at the time. Lujan was sitting on a chair or bed. Lujan seemed "a little paranoid." Jacob was talking to Garcia, who was showing Jacob "his new toy," i.e., his new gun. Garcia was not pointing the gun at Lujan and was facing away from Lujan, and Lujan suddenly shot at Garcia once or twice. Garcia then fired back three or four times. Jacob said that Lujan was using the gang's floater gun, a revolver. Jacob immediately ran away after the shooting. He learned that Garcia had been arrested for the shooting in June 2016. Jacob's fingerprints were found on beer bottles and a beer can collected from the back house on the night of the shooting.

Law enforcement investigated and arrested Jacob concerning a separate matter in January 2017. When Jacob was in custody, an officer asked him about this matter. Jacob told the officer that he was not at Joseph's home on the night of the shooting. He was not truthful with the officer because he did not want to get involved. Jacob did not want to be considered a "'snitch,'" and he was also worried about his own case at the time. He was on probation at the time of the shooting. Jacob first disclosed that Lujan had a gun and shot at Garcia when Jacob spoke with a defense investigator in 2022.

Jacob testified at trial because it was "not right" that Garcia was being tried for murder, and Jacob wanted to tell the truth. He was "on a good path now" and was less concerned about trying "to be who [he] was trying to be then."

On cross-examination, Jacob admitted that he had a 2017 conviction for carrying a concealed and loaded firearm in a car. He committed that offense in November 2016. That conviction also had a gang enhancement attached to it. Jacob was driving the car,

7

and a fellow THL member was in the passenger seat. Jacob additionally admitted that while he was on probation for the firearm offense, he was convicted of being an accessory to robbery. He committed that offense with a member of a different gang (West Side Verdugo). Jacob helped the perpetrator of the robbery escape by driving the perpetrator away from the scene and dropping him at a bus stop.

The defense investigator who interviewed Jacob in 2022 also testified at trial. Jacob told the investigator that Garcia entered the back house and shook everyone's hand, including Lujan's. Lujan was sitting on the bed, and Garcia was standing seven to 10 feet away, close to the door. Garcia was showing Jacob a new handgun when Lujan suddenly pointed a .22-caliber revolver at Garcia. Lujan fired at least once at Garcia, and Garcia fired back more than three times. Jacob said that Garcia fired "in self-defense." Jacob reported that all the people in the room were South Fontana gang members, and they were all friends with both Lujan and Garcia.

II.    *Verdict and sentence*

Garcia's trial occurred over a number of days in February, March, and April 2023. The jurors found him guilty of first degree premeditated murder and being a felon in possession of a firearm. (§§ 187, subd. (a), 189, subd. (a), 29800, subd. (a)(1).) They also found that Garcia personally and intentionally discharged a firearm, causing death. (§ 12022.53, subd. (d).) Garcia admitted that he had one prior serious felony conviction and one prior strike conviction. (§§ 667, subds. (a)(1), (b)-(i), 1170.12, subds. (a)-(d).)

In April 2024, the court sentenced Garcia to 50 years to life in prison, consisting of 25 years to life for the murder conviction and 25 years to life for the firearm

8

enhancement. The court imposed a prison term for the firearm conviction but stayed it under section 654. The court dismissed the prior strike and the prior serious felony enhancement.

DISCUSSION

I.      *Motion to disqualify the San Bernardino County District Attorney's Office*

Jason Anderson, the San Bernardino County District Attorney, represented Garcia in a separate matter before taking office. Garcia argues that Anderson's representation created a conflict of interest rendering it likely that Garcia would be treated unfairly in this case. He argues that the court therefore erred by denying his motion to disqualify the entire district attorney's office. Additionally, he argues that defense counsel rendered ineffective assistance in connection with the motion to disqualify. The arguments lack merit.

A.      *Additional background*

Garcia moved to disqualify the district attorney's office in May 2020. Defense counsel filed a declaration in support of the motion. According to the declaration, Anderson represented Garcia at two probation violation hearings in November 2014. Defense counsel declared that "[p]resumably, some private and confidential meetings/discussions were held," and counsel asked the court to hold an in camera hearing at which Garcia and Anderson could testify regarding the prior representation. The moving papers argued that if Anderson was providing competent and effective representation, then it could be assumed that Garcia shared confidential and privileged information with him. Garcia contended that the sharing of such information meant that

9

the district attorney's office could not prosecute this case in an evenhanded manner, and the circumstances gave rise to an actual and apparent conflict of interest. He asked the court to disqualify the entire district attorney's office under section 1424.

The People opposed the motion. According to their opposition brief, Garcia was charged with three misdemeanors in 2013. The court appointed a defense attorney from the conflict panel to represent Garcia. In February 2014, Garcia pled guilty to a misdemeanor violation of section 148, subdivision (a)(1) (resisting, delaying, or obstructing a peace officer). The court sentenced him to three years of informal probation, including the condition that he serve 40 days in county jail. He failed to appear for his jail time, and the court set the matter for a probation violation hearing. Anderson represented Garcia at the probation violation hearing in November 2014, when Anderson was a member of the conflict panel. The court held another probation violation hearing on July 20, 2016, after Garcia failed to appear for his jail time again, and Anderson also represented Garcia at that hearing. Garcia admitted the probation violation at the July 2016 hearing, and the court terminated probation. Anderson took office as the San Bernardino County District Attorney in January 2019. The People argued that Anderson's prior representation of Garcia did not create a conflict of interest, and even if it did, the conflict was not so grave that Garcia was unlikely to receive a fair trial.

The court held a hearing on the motion to disqualify in February 2023. The court denied the motion, finding that Garcia had not established a conflict of interest or that any

10

conflict would impact his ability to receive a fair trial. The court noted that "this case happened after the representation in the other."

After Garcia appealed, we granted his request for judicial notice of court records concerning his misdemeanor case. (*People v. Garcia*, Super. Ct. San Bernardino County, No. TVA1301341.) According to the records in that case, Anderson did not represent Garcia when he pled no contest to the misdemeanor in February 2014, but Anderson represented him at the probation violation hearing in November 2014. Garcia was present at that hearing. The court reinstated probation and ordered Garcia to serve 40 days in jail. The court revoked Garcia's probation in April 2015 after he again failed to appear for jail time, and Anderson represented him at a probation violation hearing in November 2015. Garcia was not present at the November 2015 hearing, and the minutes identify his custody status as "fugitive." (Capitalization omitted.) Garcia again failed to appear for a hearing in May 2016, and the court ordered his bail bond forfeited and issued a bench warrant. Garcia was represented by someone else from the conflict panel at that hearing, not Anderson. Garcia was in custody and appeared for a probation violation hearing on July 7, 2016, but he again was represented by someone other than Anderson.

Anderson appeared with Garcia at the next probation violation hearing on July 20, 2016, when Garcia admitted the violation. On that same date, the court held a "Pre-Preliminary Hearing" in this case. Garcia was represented by a deputy public defender in this case. (He retained counsel later.) The same judge presided over the July 20 hearings in this case and the misdemeanor case, and the same prosecutor appeared for the People in both cases.

B.    *Analysis*

Section 1424 governs a motion to disqualify a prosecutor. (*People v. Cardenas* (2025) 18 Cal.5th 797, 811 (*Cardenas*).) The court may not grant the motion "unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (§ 1424, subd. (a)(1).) "The statute sets out a two-part test." (*Cardenas*, at p. 811.) The moving defendant must show that (1) a conflict of interest exists, and (2) the conflict is "'so grave as to render it unlikely that [the] defendant will receive fair treatment during all portions of the criminal proceedings.'" (*People v. Eubanks* (1996) 14 Cal.4th 580, 593 (*Eubanks*), italics omitted; *Cardenas*, at p. 811.)

A conflict of interest "exists whenever the circumstances of a case evidence a reasonable possibility that the [prosecutor's] office may not exercise its discretionary function in an evenhanded manner." (*People v. Conner* (1983) 34 Cal.3d 141, 148.) With respect to the gravity of the conflict, the court "must consider the entire complex of facts surrounding the conflict to determine whether the conflict makes fair and impartial treatment of the defendant unlikely." (*Eubanks*, *supra*, 14 Cal.4th at p. 599.) Section 1424 "does not allow disqualification merely because the district attorney's further participation in the prosecution would be unseemly, would *appear* improper, or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system." (*Eubanks*, at p. 592.) "Only an actual likelihood of unfair treatment, not a subjective perception of impropriety, can warrant a court's taking the significant step of recusing an individual prosecutor or prosecutor's office." (*Haraguchi v. Superior Court*

12

(2008) 43 Cal.4th 706, 719, italics omitted.) Moreover, when the defendant seeks to disqualify not just an individual prosecutor but the entire prosecuting office, they "must make an 'especially persuasive' showing." (*People v. Gamache* (2010) 48 Cal.4th 347, 361 (*Gamache*).)

The defendant's motion must "contain a statement of facts setting forth the grounds for the claimed disqualification and the legal authorities relied upon by the moving party and shall be supported by affidavits of witnesses who are competent to testify to the facts set forth in the affidavit." (§ 1424, subd. (a)(1).) The prosecuting attorney may file affidavits in opposition to the motion. (*Ibid.*) "'An evidentiary hearing may be ordered if the defendant's affidavits establish a prima facie case for recusal—that is, if the defendant's affidavits, if credited, would require recusal.'" (*Cardenas*, *supra*, 18 Cal.5th at p. 811, italics omitted.)

We review for abuse of discretion the trial court's ruling on whether to grant an evidentiary hearing. (*Cardenas*, *supra*, 18 Cal.5th at pp. 811-812.) Likewise, we review for abuse of discretion the denial of a motion to disqualify the prosecutor. (*Id.* at p. 812.) We review the court's underlying factual findings for substantial evidence. (*Ibid.*)

The court did not abuse its discretion by denying Garcia's motion to disqualify the district attorney's office. Garcia offered no evidence that a conflict of interest existed or that the conflict was so grave as to render it unlikely that he would receive a fair trial. The only evidence that he offered was defense counsel's declaration that Anderson represented Garcia at probation violation hearings in a separate case in November 2014. The bare fact of Anderson's representation at two probation violation hearings does not

13

establish a reasonable possibility that the district attorney's office might not exercise its discretion in an evenhanded manner in this prosecution. Garcia offered no evidence that Anderson learned any confidential or privileged information about him that might affect the prosecutor's discretionary decisions in this case. And even if the bare fact of Anderson's representation showed a conflict of interest, Garcia offered no evidence demonstrating that the conflict was so grave as to render it unlikely that he would receive a fair trial. Section 1424 requires evidence of an actual likelihood of unfair treatment, not the mere appearance of impropriety or unseemliness.

We reach the same conclusion if the court considered the statement in the People's opposition brief that Anderson represented Garcia at the probation violation hearing in July 2016. The shooting of Lujan occurred in June 2016, Garcia was arrested in late June, and the People filed the felony complaint charging Garcia with murder on June 30, 2016. Garcia argues that Anderson would have discussed the pending murder charges with him, including Garcia's claim of self-defense, because the charges could have constituted another probation violation, and there was a hearing in this case on the same day as the probation violation hearing.

Garcia's argument amounts to speculation, not evidence. Again, Garcia offered no evidence that Anderson discussed the pending murder charges with him or learned anything confidential or privileged concerning this case. He acknowledges that he offered no "direct evidence" that Anderson obtained confidential information from him, but he relies on *People v. Lepe* (1985) 164 Cal.App.3d 685 (*Lepe*) to suggest that "the realities of a criminal defense" rendered such a showing unnecessary. (*Id.* at p. 688.)

14

*Lepe* is inapposite. The trial court in *Lepe* granted the defendant's motion to disqualify the district attorney's office, and the appellate court affirmed. (*Lepe*, *supra*, 164 Cal.App.3d at p. 687.) The defendant moved to disqualify the office because the county district attorney, Storey, had defended him in two related cases before taking office, and Storey's office was prosecuting the defendant for a third related crime. (*Id.* at pp. 686-687.) In the first case, the defendant was charged with assault. (*Id.* at p. 686.) In the second case, the defendant was charged with intimidating two witnesses in the assault prosecution. (*Ibid.*) And in the third case, the defendant was charged with assault with a deadly weapon on the same two witnesses. (*Id.* at pp. 686-687.) Thus, Storey had represented the defendant in the initial assault case and the related witness intimidation case, but he was prosecuting the defendant in the related assault case in which the same witnesses were victims.

The *Lepe* court observed that the defendant failed to offer evidence that Storey obtained confidential information while defending the first two cases. (*Lepe*, *supra*, 164 Cal.App.3d at p. 688.) The court nevertheless "accept[ed] the realities of a criminal defense" and reasoned that the defendant "had to relate to Storey the circumstances of the first assault witnessed by [two individuals] and his later intimidation of those witnesses." (*Ibid.*) The court further concluded: "That information necessarily includes the basis for [the defendant's] hostility toward the now twice-tormented victims with resultant inference of his propensities toward assault and intimidation. [The defendant's] personality traits, lifestyle, associations, thought patterns, attitudes—all are eventually known to thoughtful and prepared counsel. We are sufficiently worldly to conclude

15

Storey's prior representation of [the defendant] included his obtaining confidential information from [the defendant]. It follows the risk of disclosure of that information gives rise to a conflict of interest." (*Ibid.*)

The *Lepe* court additionally held that the conflict rendered it unlikely that the defendant would receive a fair trial in the case charging assault of the two witnesses. (*Lepe*, *supra*, 164 Cal.App.3d at p. 689.) Storey's prosecution of the case "necessarily would be influenced by his knowledge of the victims" and the defendant. (*Ibid.*) Moreover, there was a pending motion to amend the information to add allegations concerning the defendant's prior assault conviction (the first case in which Storey represented the defendant). (*Id.* at pp. 686-687 & fn. 1.) Defense counsel intended to move to set aside the plea to that prior assault charge on the ground that Storey had rendered ineffective assistance. (*Id.* at p. 687, fn. 1.) The court concluded that "Storey would be inclined vigorously to amend the information to include the prior and to uphold its validity against [the defendant's] contention of constitutional infirmity for lack of proper lawyering by Storey." (*Id.* at pp. 688-689.) The defendant was unlikely to receive a fair trial for that additional reason. (*Ibid.*)

Garcia's case is far from *Lepe*. The three cases in *Lepe* were closely related. No evidence was required to show a conflict of interest beyond the circumstances of the three cases and their intertwined nature. In contrast, Garcia's misdemeanor charge for resisting or obstructing a peace officer and his probation violation for failing to appear for jail time were unrelated to this case. The misdemeanor offense and the failure to appear occurred years before the shooting in this case, the cases do not involve the same victims, and

16

Garcia was not being charged with a probation violation for the events in this case. In short, the court had no reason to conclude that Anderson necessarily learned confidential information about the charged shooting or any personal information that might bear on this case, such as a propensity for violence. Moreover, unlike *Lepe*, this case does not involve a claim that Anderson provided ineffective assistance in the probation violation proceedings. Anderson does not have to vigorously defend his prior performance like the district attorney in *Lepe*.

Garcia raises four more arguments, and all are meritless. First, he asserts that the court denied the motion to disqualify because it lacked evidentiary support, yet the court did not give him a chance to question Anderson at an in camera hearing. But the court was not required to hold an evidentiary hearing. It had discretion to do so if Garcia's affidavits established a prima facie case for disqualification. (*Cardenas*, *supra*, 18 Cal.5th at p. 811.) The only declaration supporting the motion stated that Anderson represented Garcia at two probation violation hearings in November 2014 and that Anderson "[p]resumably" had some private and confidential discussions with Garcia. None of that established a prima facie case that a conflict of interest existed or that any conflict rendered it unlikely that Garcia would receive a fair trial.

Second, Garcia argues that the court's ruling rested on a finding that was not supported by substantial evidence. Specifically, he claims that the court misunderstood the timing of Anderson's representation when it stated that "this case happened after the representation in the other." Garcia contends that the statement was not supported by substantial evidence, because Anderson represented Garcia in July 2016, just after Garcia

was charged with murder. But the court had no evidence that Anderson represented Garcia at the July 2016 hearing. That information came from the People's opposition brief, and the unsworn statements of counsel are not evidence. (*In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11.) In any event, before ruling, the court made clear that it had reviewed both the moving papers and the People's opposition brief. To the extent that it credited the information in the People's brief, the court's comment does not necessarily reflect a misunderstanding of when Anderson represented Garcia. Very little occurred in this case by July 2016, and nearly all the proceedings occurred well after July 2016. The court's comment can be reasonably interpreted to mean only that this case did not get well underway until after Anderson's representation in the misdemeanor case.

Third, Garcia argues that the court violated his federal due process rights by denying the motion to disqualify. The argument fails because "section 1424's recusal standards are prophylactic in nature and 'serve[] to prevent potential constitutional [due process] violations from occurring.' [Citation.] If recusal was properly denied under section 1424, ipso facto no due process violation occurred." (*Gamache, supra*, 48 Cal.4th at p. 366.)

Fourth and finally, Garcia argues that defense counsel rendered ineffective assistance by misstating the dates when Anderson represented Garcia and failing to correct the court's claimed misunderstanding of the dates. "To demonstrate ineffective assistance of counsel, [the defendant] 'must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.) Counsel's deficient performance is prejudicial if "there is a

18

reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301.)

It is true that defense counsel's declaration in support of the motion misstated the dates when Anderson appeared for Garcia. The declaration said that Anderson represented him at two hearings in November 2014, but the court records show that the hearings occurred in November 2014 and November 2015. The declaration also failed to mention the July 2016 hearing.

Assuming for the sake of argument that the misstatements amounted to deficient performance, the misstatements were not prejudicial. Garcia was not present for the November 2015 hearing when Anderson appeared for him; Garcia was a fugitive at that time. Anderson would not have had any confidential or private discussions with an absent client. There is no reasonable probability that the court would have found a disqualifying conflict of interest on the basis of the November 2015 appearance. Nor is there a reasonable probability that the court would have found a disqualifying conflict of interest if defense counsel's declaration had included the July 2016 appearance or counsel had mentioned it at the hearing. As already explained, the bare fact of that appearance in an unrelated matter did not tend to show that Anderson learned anything confidential or privileged concerning this case.

In sum, the court did not abuse its discretion or violate Garcia's right to due process by denying his motion to disqualify the district attorney's office. Garcia's related ineffective assistance claim also fails.

II.    *Claims of prosecutorial misconduct*

Garcia argues that the prosecutor committed prejudicial misconduct in two respects:  (1) The prosecutor failed to disclose Jacob's convictions before eliciting that evidence on cross-examination, and (2) the prosecutor misstated the law regarding premeditation and deliberation.  Both arguments lack merit.

A.    *Legal framework*

"In California, the law regarding prosecutorial misconduct is settled:  'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated.  Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.'"  (*People v. Masters* (2016) 62 Cal.4th 1019, 1052.)

Even if prosecutorial misconduct occurs, reversal is not required unless the defendant demonstrates that prejudice resulted.  (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.)  To the extent that prosecutorial misconduct violates the federal constitution, we evaluate whether the misconduct was harmless beyond a reasonable doubt.  (*Ibid.*, citing *Chapman v. California* (1967) 386 U.S. 18.)  If the misconduct implicates state law only, then we evaluate whether it is reasonably probable that the defendant would have achieved a more favorable result absent the misconduct.  (*People v. Parker* (2022) 13 Cal.5th 1, 71-72; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

"'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.'" (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 306.)

B.     *Jacob's convictions*

Jacob testified on cross-examination that he had convictions for the firearm offense and the accessory offense, and the People elicited some limited testimony regarding the facts underlying those offenses. We conclude that even if the prosecutor committed misconduct by failing to disclose the convictions earlier, the failure to do so did not prejudice Garcia.

1.     *Additional background*

Defense counsel did not object when the People questioned Jacob about his convictions, but counsel requested a sidebar conference after the prosecutor elicited most of the testimony. The sidebar conference was unreported. The next morning, defense counsel made an oral motion for mistrial. Counsel argued that under section 1054.1, the People had a duty to disclose any felony convictions of a material witness whose credibility is likely to be critical, and Jacob was such a witness. Counsel stated that in July 2022, the defense disclosed the defense investigator's report regarding Jacob's statements, so the People were aware that Jacob would be a material witness well before trial. Counsel asserted that there should have been an in limine hearing regarding the convictions before Jacob testified. He also noted that at the earlier sidebar conference, the court had directed the People to provide Jacob's "Rap Sheet" so that the defense

21

could review it before redirect examination.[1]  But defense counsel argued that the "bell ha[d] rung," no curative instruction would cure the People's discovery violation, and a mistrial was warranted.

The court agreed that there should have been an in limine hearing regarding the evidence of Jacob's convictions.  But the court was unsure whether the People had violated the discovery statute (§ 1054.1), and it wanted to give the People time to respond.  The next day, the People argued that they had no duty to disclose Jacob's convictions.  They contended that the evidence was not exculpatory under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), and section 1054.1 did not require them to disclose impeachment evidence for witnesses whom they did not intend to call.  They also argued that even if they had disclosed the offenses beforehand, "nothing would have changed or played out differently."  The offenses were crimes of moral turpitude, and the evidence therefore was admissible to impeach Jacob's credibility.  Further, the People observed that Jacob's convictions could not have been "a complete surprise" to the defense.  According to the defense investigator's report, Jacob told the investigator in 2022 that he had just completed a probation term, and defense counsel had a statutory right to access rap sheets.[2]  The People additionally argued that the limited evidence

---

[1]  The Department of Justice maintains "summary criminal history information" on individuals (§ 11105, subd. (a)(1)) that is commonly called a rap sheet.  (E.g., Cal. Code Regs., tit. 15, §§ 2000, subd. (b)(86), 3000; *People v. Webber* (1991) 228 Cal.App.3d 1146, 1167.)  "Rap" stands for "record of arrests and prosecutions."  (E.g., Cal. Code Regs., tit. 9, § 4012; *id.*, tit. 15, § 2449.4, subd. (b)(1).)

[2]  Section 11105 states that the Attorney General "shall furnish" rap sheets to a public defender or defense counsel of record if the information is requested in the course

regarding Jacob's convictions was "a drop in the bucket compared to the mountain of other evidence that goes against his credibility."

The court denied the motion for mistrial. The court ruled that the People had no duty to disclose the convictions of defense witnesses and that the prosecutor did not commit misconduct. It also reasoned that the evidence was admissible and probative of Jacob's credibility. The court noted that there was "a jury instruction that talks about 'prior acts do not destroy a witness's credibility,'" and that was "an important point" to mention to the jury. The court later gave the instruction to the jurors (CALCRIM No. 316), stating: "If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."

Garcia moved for a new trial after the jury returned its verdict. He raised several arguments, including that the court erred by admitting evidence of Jacob's convictions without holding an in limine hearing. He also asserted that the prosecutor's claimed discovery violation "may be tantamount to prosecutorial misconduct." At the hearing on the new trial motion, defense counsel argued that the People should have disclosed Jacob's rap sheet, plus any police reports on which they relied to question him about the

_____

of representing a person in a criminal case. (§ 11105, subd. (b)(9); see also 105 Ops. Cal.Atty.Gen. 157 (2022) [in response to a proper application, the Department of Justice will provide defense counsel with a copy of a victim's or witness's rap sheet].)

23

underlying facts of the offenses. The prosecutor stated that she relied on probation reports but not police reports. The court denied the new trial motion.

   2.   *Analysis*

Section 1054.1 governs the prosecution's discovery obligations. (*People v. Verdugo* (2010) 50 Cal.4th 263, 279 (*Verdugo*).) The statute requires the People to disclose certain categories of evidence, including the "names and addresses of persons the prosecutor intends to call as witnesses at trial" (§ 1054.1, subd. (a)), the "[s]tatements of all defendants" (*id.*, subd. (b)), all "relevant real evidence seized or obtained as a part of the investigation of the offenses charged" (*id.*, subd. (c)), the "existence of a felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial" (*id.*, subd. (d)), "[a]ny exculpatory evidence" (*id.*, subd. (e)), and "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial" (*id.*, subd. (f)).

To establish that the People violated their duty to disclose a witness, "the record must affirmatively demonstrate that a specific witness or witnesses were known to and intended to be called by the prosecutor, but were undisclosed to the defense." (*People v. Tillis* (1998) 18 Cal.4th 284, 292.) "Appellate courts should not engage in speculation about witnesses whose identity or existence is not demonstrated on the face of the record, as any other conclusion threatens to invade counsel's discretion whether to call a witness." (*Ibid*.)

Under *Brady*, the defendant has a federal due process right to disclosure of "evidence favorable to an accused … where the evidence is material either to guilt or to

punishment." (*Brady*, *supra*, 373 U.S. at p. 87; *Verdugo*, *supra*, 50 Cal.4th at p. 279.) But "*Brady* and its progeny serve 'to restrict the prosecution's ability to suppress evidence rather than to provide the accused a right to criminal discovery.'" (*People v. Morrison* (2004) 34 Cal.4th 698, 715.) Evidence "that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery." (*Ibid.*)

Garcia argues that the People had a constitutional obligation to disclose the underlying facts of Jacob's convictions, because the evidence could have been favorable to Garcia. He contends that to the extent Jacob committed the offenses with THL members, the evidence tended to show that Jacob was loyal to Lujan's clique (THL) and therefore was unlikely to lie to protect Garcia. Garcia relies on case law applying *Brady* (*People v. Little* (1997) 59 Cal.App.4th 426, 433-434), but there was no *Brady* violation. The People presented the evidence at trial, so it was not suppressed for purposes of *Brady*.

Garcia also argues that section 1054.1, subdivisions (a) and (f), required the People to disclose the information in Jacob's probation reports. He contends that if Jacob denied the facts underlying the offenses, then the People must have intended to call the individuals whose statements were in the probation reports. He asserts that the information thus qualified as names of witnesses and statements of witnesses whom the prosecutor intended to call. (§ 1054.1, subds. (a), (f).) But Garcia fails to carry his burden of showing a violation of those provisions. He does not identify the specific witnesses whom the People purportedly intended to call but did not disclose, and we do

25

not speculate "about witnesses whose identity or existence is not demonstrated on the face of the record." (*People v. Tillis*, *supra*, 18 Cal.4th at p. 292.)

Garcia further argues that the People violated subdivision (d) of section 1054.1 by failing to disclose Jacob's convictions. The plain language of subdivision (d) does not limit the People's duty to witnesses whom the prosecutor intends to call. Rather, subdivision (d) of section 1054.1 applies to felony convictions "of any material witness whose credibility is likely to be critical to the outcome of the trial."

We assume for the sake of argument that the failure to disclose Jacob's convictions violated subdivision (d) of section 1054.1 and amounted to prosecutorial misconduct under state law. Nevertheless, the presumed misconduct did not prejudice Garcia, because it is not reasonably probable that he would have achieved a more favorable result absent the misconduct.[3]

First, there is no reasonable probability that the court would have excluded evidence of the convictions if the prosecutor had disclosed them before cross-examination. The court determined that the evidence was admissible and probative of Jacob's credibility when it denied the motion for mistrial. Indeed, witnesses may be impeached with "any prior conduct involving moral turpitude" (*People v. Clark* (2011) 52 Cal.4th 856, 931), and courts have held that Garcia's offenses qualify as crimes of moral turpitude. (*In re Young* (1989) 49 Cal.3d 257, 264 [accessory to a felony is a crime

---

[3]     Garcia has not shown that the claimed discovery violation rose to the level of a due process violation infecting the "'fairness of the trial as a whole.'" (*People v. Ochoa* (1998) 19 Cal.4th 353, 474; *ibid.* ["what occurred was a discovery violation, not a due process violation"].) We accordingly do not apply the *Chapman* standard of prejudice.

of moral turpitude]; *People v. Aguilar* (2016) 245 Cal.App.4th 1010, 1019 [carrying a concealed firearm in a vehicle is a crime of moral turpitude].)

Second, Garcia argues that disclosure of the convictions would have permitted defense counsel "'to take the sting away'" by eliciting the evidence on direct examination, but there is no reasonable probability that the jurors would have evaluated Jacob's credibility more favorably in that event. The evidence still would have been admitted, and plenty of other evidence undermined Jacob's credibility. Jacob said that he lied to officers when he told them that he was not at the scene of the shooting. It was over five years later when he eventually told the defense investigator that he was there and that Garcia acted in self-defense. Further, the jurors learned that Jacob had a criminal history from other testimony—he said that he was on probation at the time of the shooting in 2016, and he was in custody concerning a separate matter when officers interviewed him about this case. Moreover, Jacob's testimony on the undisclosed priors was brief—it is roughly three pages of the prosecutor's 32-page cross-examination in the reporter's transcript. The prosecutor attacked Jacob's credibility in her closing and rebuttal argument, but she never mentioned Jacob's convictions. Instead, she based her argument on Jacob's delay in reporting the events, inconsistencies in his statements, and the asserted implausibility of his version of events. And to the extent that the jurors considered Jacob's convictions, the court instructed them that the convictions did not necessarily destroy or impair his credibility. We presume that they followed that

instruction. (*People v. Chhoun* (2021) 11 Cal.5th 1, 30.) On this record, any failure to disclose Jacob's convictions earlier was not prejudicial.[4]

For similar reasons, we reject Garcia's argument that the court erred by denying his mistrial motion based on the claimed misconduct. "[W]e review a ruling on a motion for mistrial for an abuse of discretion, and such a motion should be granted only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Ayala* (2000) 23 Cal.4th 225, 283.) As already explained, the court correctly determined that the evidence of Jacob's convictions was admissible and probative of his credibility. The only claimed damage was that defense counsel lost the opportunity to introduce the evidence on direct examination. We are not persuaded that the loss irreparably damaged Garcia's chances of a fair trial. Jacob's credibility was impeached by other evidence, the jurors could consider the convictions whether the evidence was offered on direct or cross-examination, and the court intended to instruct the jury that the convictions did not necessarily destroy Jacob's credibility. The claimed discovery violation also did not preclude Garcia's self-defense theory. The jury was still able to consider and weigh Jacob's testimony and Garcia's statements in determining whether Garcia shot in self-defense. Under those circumstances, the court did not abuse its discretion by denying the mistrial motion.

---

[4] Garcia's argument that the court erred by denying his new trial motion fails for the same reason—any misconduct was harmless. (§ 1181, subd. (5) [allowing the court to grant a new trial on the basis of "prejudicial misconduct" by the prosecutor].)

For all the foregoing reasons, the prosecutor did not commit prejudicial misconduct by failing to disclose Jacob's convictions before cross-examining him, and the court did not err by denying Garcia's mistrial and new trial motions based on the claimed misconduct.

C.      *Prosecutor's statement of law regarding premeditation and deliberation*

Garcia contends that the prosecutor misstated the law by arguing that premeditation and deliberation "can be immediate." Defense counsel did not object to the challenged statement during closing argument, but Garcia contends that the failure amounted to ineffective assistance. The argument is meritless.

1.      *The prosecutor's statement*

In closing argument, the prosecutor described premeditation and deliberation as follows: "So it's second-degree murder, but then all—then we have first-degree murder, and everything is the same as far as the elements between first and second degree, except that the People have to prove that the Defendant committed this murder willfully, deliberately and with premeditation. Right? He intended to kill. He weighed the consequences of his choice. He decided to kill before acting. And there's no set period of time when it comes to deliberation, premeditation. It can be immediate. [¶] An example of that is if you're driving, you are approaching a traffic light. Initial—initially as you see it, you're approaching it. It turns green. It's green, and then it turns yellow. Right? And there's a lot of things that you consider. You can consider in determining whether or not we're deciding, 'Okay. I'm going to go through this light.' Is there a car in front of you? Are there pedestrians nearby? Is there a cop around? And how far

29

away[]—'away am I from the limit line?'  And all of these things, all of these considerations you can make in a short period of time.  It can be immediate; right?  So the deliberation and premeditation required by the law there is no set period of time.  It can be immediate.  [¶]  And a calculated decision, the law tells you, to kill can be made quickly."

### 2.    *Analysis*

"A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.  [Citation.]  'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance."  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)  However, "'[p]remeditation and deliberation can occur in a brief interval.  "The test is not time, but reflection.  'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'"'"  (*People v. Sanchez* (2001) 26 Cal.4th 834, 849.)  Indeed, to find premeditated murder, "'[t]here need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as successive thoughts of the mind.'"  (*People v. Thomas* (1945) 25 Cal.2d 880, 900; *People v. Lynn* (1984) 159 Cal.App.3d 715, 726 ["premeditation may be instantaneous"].)

The prosecutor did not misstate the law.  The statement that premeditation and deliberation "can be immediate" is consistent with our courts' descriptions of the concepts, namely, that premeditation and deliberation can occur quickly, with great rapidity, in a brief interval, or even instantaneously.  Further, the prosecutor did not make the statement in isolation.  She expressly connected her statement to the yellow light

analogy, explaining that the decision whether to drive through a yellow light exemplified how premeditation and deliberation can be immediate.  Our Supreme Court has approved the yellow light analogy to explain premeditation and deliberation.  (*People v. Aguirre* (2025) 18 Cal.5th 629, 708.)  Particularly in context of the analogy, there is no reasonable likelihood that the jurors applied her statement in an erroneous manner.  (*People v. Meneses* (2019) 41 Cal.App.5th 63, 74.)

Because the prosecutor did not misstate the law concerning premeditation and deliberation, she did not commit misconduct under state law or the federal constitution. It follows that defense counsel did not render ineffective assistance by failing to raise a meritless objection.  (*People v. Ochoa*, *supra*, 19 Cal.4th at p. 463 ["Representation does not become deficient for failing to make meritless objections"].)

III.    *Failure to instruct on heat of passion theory of voluntary manslaughter*

Garcia argues that the court erred by failing to instruct the jury sua sponte on the heat of passion theory of voluntary manslaughter.  The People contend that Garcia invited any error when defense counsel told the court that he was not requesting the heat of passion instruction.  Regardless of whether Garcia invited the claimed error, any error was harmless beyond a reasonable doubt.

The trial court has a sua sponte obligation to instruct the jury on a lesser included offense "if substantial evidence exists indicating that the defendant is guilty only of the lesser offense."  (*People v. Manriquez* (2005) 37 Cal.4th 547, 584; *People v. Barton* (1995) 12 Cal.4th 186, 194-195.)  The court has that obligation "notwithstanding the defendant's objection to the instruction."  (*Barton*, at p. 198.)  "'Substantial evidence' in

this context is "'evidence from which a jury composed of reasonable [persons] could … conclude[]'" that the lesser offense, but not the greater, was committed." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*), disapproved on another ground by *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7 (*Schuller*).) "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight" (*Breverman*, at p. 177) and thus does "not evaluate the credibility of witnesses" (*id.* at p. 162). We independently review whether the trial court should have instructed on a lesser included offense. (*Manriquez*, at p. 584.)

"Manslaughter is a lesser included offense of murder." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).) One type of voluntary manslaughter is "a killing without malice 'upon a sudden quarrel or heat of passion.'" (*Id.* at p. 947, quoting § 192, subd. (a).) "Heat of passion arises if, '"at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*Beltran*, at p. 942.)

The "passion aroused need not be anger or rage, but can be any ""[v]iolent, intense, high-wrought or enthusiastic emotion""" [citation] other than" a desire for revenge. (*Breverman*, *supra*, 19 Cal.4th at p. 163.) Fear or panic may be the emotion that causes a person to act in the heat of passion. (*People v. Dominguez* (2021) 66

32

Cal.App.5th 163, 180.) If there is evidence that the victim attacked the defendant first, then "instructions on heat of passion may be required in addition to those on reasonable and/or imperfect self-defense." (*Ibid.*) "The victim's conduct that justifies the use of some force in self-defense will often be the reasonable provocation that causes a defendant to lose self-control in the heat of passion." (*Id.* at p. 181.)

We assume for the sake of argument that the evidence supporting Garcia's self-defense theory constituted substantial evidence to support instructing on the heat of passion theory of voluntary manslaughter. (See *In re Hampton* (2020) 48 Cal.App.5th 463, 480-481 [in addition to lawful self-defense and imperfect self-defense instructions, heat of passion instruction was supported by evidence of a struggle between the defendant and the murder victim in which the victim appeared to reach for a gun].) Even so, the failure to instruct on the heat of passion theory was harmless.

If heat of passion is at issue, then the malice element of murder requires the People to prove beyond a reasonable doubt that the killing was not done in the heat of passion. (*People v. Rios* (2000) 23 Cal.4th 450, 462; see *Schuller*, *supra*, 15 Cal.5th at p. 243 ["When imperfect self-defense is at issue, the malice element of murder requires the People to show the absence of that circumstance beyond a reasonable doubt"].) "Thus, when there is substantial evidence to support the theory, the failure to instruct on [heat of passion] amounts to an incomplete instruction on an actual element of murder, namely malice." (*Schuller*, at pp. 243-244.) That form of misinstruction qualifies as federal constitutional error subject to the harmless "'beyond a reasonable doubt' standard for evaluating prejudice" under *Chapman*. (*Schuller*, at p. 260.)

In this context, the *Chapman* standard "compels the reviewing court to reverse the conviction unless it concludes that no 'rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict the defendant [absent the instructional error].'" (*Schuller*, *supra*, 15 Cal.5th at p. 244.) We reach that conclusion in this case. No rational juror who heard the evidence and made the findings reflected in the verdict could have had reasonable doubt that Garcia was not acting in the heat of passion. In particular, the jury's finding that Garcia committed murder with premeditation and deliberation shows that the error was harmless beyond a reasonable doubt.

As relevant here, the instruction on the heat of passion theory of voluntary manslaughter states that the defendant killed someone in the heat of passion if "the defendant acted rashly and under the influence of intense emotion." (CALCRIM No. 570.) The instruction also states that the People have the burden of proving beyond a reasonable doubt that the defendant did not kill in the heat of passion. (*Ibid.*)

The court instructed the jury on only one theory of first degree murder—willful, deliberate, and premeditated murder pursuant to CACLRIM No. 521. The court thus informed the jurors: "The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the act that caused death." (Italics omitted.) The court further instructed the jury: "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." And the court instructed the jurors that the People had the burden of

34

proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime, such as second degree murder.

In closing argument, the People argued that the shooting of Lujan was premeditated and deliberate. The prosecutor emphasized the evidence that Garcia had a motive to kill Lujan—he believed that Lujan had killed his friend Tony (i.e., Anthony Abreo). She also noted that Garcia was not invited to Joseph's house that night; Garcia showed up unexpectedly; he must have seen Lujan's red Mustang outside the house; and he initially appeared peaceful and shook hands with everyone. But within minutes of arriving, he shot Lujan multiple times from only a few feet away. He had a getaway driver who did not go into the party with him. The prosecutor argued that the evidence showed that the shooting was an "ambush."

After hearing all the evidence and argument, the jury found beyond a reasonable doubt that Garcia killed Lujan with premeditation and deliberation. The jurors thus found beyond a reasonable doubt that Garcia did not decide to kill "rashly, impulsively, or without careful consideration." (CALCRIM No. 521 [instructing on premeditation and deliberation].) No rational juror who found beyond a reasonable doubt that Garcia did not act rashly could have also entertained a reasonable doubt that perhaps Garcia "acted rashly" for purposes of heat of passion. (CALCRIM No. 570 [instructing on heat of passion].) The two findings are "manifestly inconsistent." (*People v. Wharton* (1991) 53 Cal.3d 522, 572 (*Wharton*); *Schuller*, *supra*, 15 Cal.5th at p. 265 (conc. opn. of Liu, J.) ["voluntary manslaughter based on heat of passion is 'manifestly inconsistent' with premeditation and deliberation"].) Accordingly, the failure to instruct on the heat of

35

passion theory was harmless beyond a reasonable doubt. (*People v. Peau* (2015) 236 Cal.App.4th 823, 830-831 (*Peau*) [jury's finding of premeditation and deliberation rendered the failure to instruct on the heat of passion theory of voluntary manslaughter harmless beyond a reasonable doubt]; *People v. Wang* (2020) 46 Cal.App.5th 1055, 1071-1072 [same]; *People v. Franklin* (2018) 21 Cal.App.5th 881, 891-894 (*Franklin*) [jury's finding of premeditation and deliberation rendered the trial court's inconsistent instructions on heat of passion harmless beyond a reasonable doubt].)

Our conclusion is consistent with our Supreme Court's decision in *Wharton*, which held that an erroneous instruction on the heat of passion theory was rendered harmless by the jury's finding of premeditation and deliberation. (*Wharton*, *supra*, 53 Cal.3d at p. 572.) The court reasoned: "This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion— even if that state of mind was achieved after a considerable period of provocatory conduct—and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction." (*Ibid.*)

Our Supreme Court decided *People v. Berry* (1976) 18 Cal.3d 509 (*Berry*) roughly 15 years before *Wharton*. "*Berry* held that the failure to give a requested heat-of-passion instruction was not rendered harmless just because the defendant was convicted of first degree murder, explaining, 'While the instructions made passing reference to heat of passion and provocation for the purpose of distinguishing between murder of the first and second degrees, such reference was only casually made[,] [and] [t]here was no clear direction to the jury to consider the evidence of [the victim]'s course of provocatory

36

conduct so as to determine whether [the] defendant, as an ordinary man of average disposition [citation] having been exposed to such conduct, was provoked into committing the homicide under a heat of passion.'" (*Peau*, *supra*, 236 Cal.App.4th at p. 831, quoting *Berry*, at p. 518.)

At least two appellate courts have noted the apparent "tension" between *Berry* and *Wharton*, and they decided to follow *Wharton*. (*Peau*, *supra*, 236 Cal.App.4th at p. 831; *Franklin*, *supra*, 21 Cal.App.5th at p. 892.) In reconciling the two cases, those courts observed that *Berry*'s discussion concerned only "whether the error was harmless because the jury received some instruction on the concepts of heat of passion and provocation." (*Id.* at p. 831; *Franklin*, at p. 894.) *Berry* did not even mention that the relevant form of "first degree murder must be willful, deliberate and premeditated." (*Peau*, at p. 832; *Franklin*, at p. 894.) By contrast, *Wharton*'s "more recent reasoning" directly addressed how premeditation and deliberation "'is manifestly inconsistent'" with the heat of passion theory, so that case was "on point." (*Peau*, at p. 831; *Franklin*, at p. 894.) We agree with those courts that *Wharton* is on point and supports our conclusion that any error in this case was harmless, and *Berry* does not foreclose that conclusion. (*Peau*, at pp. 831-832; *Franklin*, at pp. 893-894; but see *People v. Ramirez* (2010) 189 Cal.App.4th 1483, 1488 [without mentioning *Wharton*, relying on *Berry* to conclude that the failure to instruct "on heat of passion voluntary manslaughter is not rendered harmless by" a finding of premeditation and deliberation].)

37

In sum, assuming that the court erred by failing to instruct the jury on the heat of passion theory of voluntary manslaughter, any error was harmless beyond a reasonable doubt.[5]

## IV. *Motion for a new trial*

Garcia lastly argues that the court applied an incorrect legal standard when denying his motion for a new trial, so we must remand for the court to reconsider the motion. We disagree.

Garcia's new trial motion argued that the verdict was "contrary to law or evidence." (§ 1181, subd. (6).) He asserted that there was insufficient evidence to prove beyond a reasonable doubt that he did not act in lawful self-defense. Garcia acknowledged that the court "does not disregard the jury's verdict or rule as if the case had been tried without a jury," but he argued that the court had a duty to independently weigh the evidence. The People's opposition brief agreed that the court should independently weigh the evidence but not "ignore the verdict or decide the case as if there had been no jury." The People observed that although some courts have described the trial court as the "'13th juror'" when deciding a new trial motion, other courts have described that characterization as misleading.

---

[5]    Garcia argues that even if no error was prejudicial alone, the cumulative effect of the asserted errors rendered his trial fundamentally unfair, requiring reversal of his murder conviction. We have assumed only a few errors—defense counsel's claimed deficient performance in connection with the motion to disqualify, the prosecutor's failure to disclose Jacob's convictions before cross-examination, and the court's failure to instruct on heat of passion. Even considering the errors together, we are not persuaded that their cumulative effect warrants reversal of the judgment. (*People v. Woodruff* (2018) 5 Cal.5th 697, 783; *People v. Bolden* (2002) 29 Cal.4th 515, 567-568.)

At the hearing on the new trial motion, the court announced its tentative ruling denying the motion. The court stated that it had reviewed the moving papers and the People's opposition. The court then said: "And the standard—I think Counsel argued the standard appropriately that the Court isn't necessarily a 13th juror, but I am looking to see if the evidence—there was credible evidence to support the jury's verdict. And ultimately, I do find that to be the case." The court reasoned that Garcia's self-defense theory was "not reasonable," and it discussed the evidence showing that Garcia committed premeditated murder. The court concluded: "So I'm not acting as a juror, but I'm looking at the jury's verdict and seeing if, in my view, there was credible evidence to support it. In the end, my tentative ruling is that there was." After hearing oral argument, the court adopted its tentative ruling and denied the motion.

We review the court's denial of a new trial motion for abuse of discretion. (*People v. Lewis* (2001) 26 Cal.4th 334, 364 (*Lewis*).) When the defendant moves for a new trial on the ground that the verdict is contrary to the evidence (§ 1181, subd. (6)), the "court must review the evidence independently, considering the proper weight to be afforded to the evidence, and then deciding whether there is sufficient credible evidence to support the verdict." (*Lewis*, at p. 364.) Some decisions have described the trial court as the "'13th juror,'" given that the court examines the evidence independently and determines whether the evidence is sufficient to prove the charged offense beyond a reasonable doubt. (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) But the court is "guided by a presumption in favor of the correctness of the verdict and proceedings supporting it." (*People v. Davis* (1995) 10 Cal.4th 463, 524.) The court should not

39

"disregard the verdict" or "decide what result it would have reached if the case had been tried without a jury." (*People v. Robarge* (1953) 41 Cal.2d 628, 633.)

Garcia contends that the court applied an incorrect legal standard, because it stated that it was not necessarily acting as the 13th juror, and the court did not indicate that it had independently weighed the evidence. But the court's comments do not show that it applied the wrong standard. We start from "the presumption … that trial judges understand and follow established law," absent a record to the contrary. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1043.) The record supports that presumption. Both parties' briefs correctly explained the legal standard, and the court confirmed that it had reviewed both briefs. The court therefore was aware that it had to independently weigh the evidence, but the court was not required to expressly state that. Moreover, the court correctly explained that it had to examine whether there was "credible evidence to support the jury's verdict." (*Lewis*, *supra*, 26 Cal.4th at p. 364 [the court must review the evidence independently and "decid[e] whether there is sufficient credible evidence to support the verdict"].) And the court's comments concerning the 13th juror standard were an apparent reference to the case law cited by the People, which describes the 13th juror standard as "misleading" and as carrying "an unfortunate connotation." (*People v. Robarge*, *supra*, 41 Cal.2d at p. 634.) Overall, it appears that the court was merely emphasizing that it could not disregard the verdict and that it had to be guided by a presumption in favor of the verdict, all of which is correct.

For these reasons, the court did not apply an incorrect legal standard when it denied the new trial motion.  Garcia accordingly fails to show that the court abused its discretion by denying the motion.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

McKINSTER
Acting P. J.

FIELDS
J.

41